UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CASE NO. 21-CR-129 (ABJ) |
| v. | : | |
| | : | |
| GABRIEL GARCIA, | : | |
| also known as "Gabriel Agustin Garcia" | : | |
| | : | |
| Defendant. | : | |

GOVERNMENT'S OPPOSITION TO
DEFENDANT'S MOTION TO TRANSFER VENUE

Defendant Gabriel Garcia, who is charged in connection with events at the U.S. Capitol on January 6, 2021, has moved to transfer venue in this case to the Southern District of Florida or, alternatively, to select a jury from a venire drawn from the Eastern District of Virginia or the District of Maryland. Garcia fails to establish that he "cannot obtain a fair and impartial trial" in this district, Fed. R. Crim. P. 21(a), and this Court should deny his motion.

## BACKGROUND

On January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election. While the certification process was proceeding, a large crowd gathered outside the United States Capitol, entered the restricted grounds, and forced entry into the Capitol building. As a result, the Joint Session and the entire official proceeding of the Congress was halted until law enforcement was able to clear the Capitol of hundreds of unlawful occupants and ensure the safety of elected officials.

Defendant Gabriel Garcia traveled to Washington, D.C., from his home in Florida and took part in the unlawful entry of the Capitol building. While inside the Crypt area of the Capitol building, Garcia participated in an aggressive confrontation with U.S. Capitol Police, during which

Case 1:21-cr-00129-ABJ   Document 61   Filed 02/28/22   Page 2 of 22

he dropped a flagpole on police officers, yelled that the officers were "fucking traitors" and told other members of the crowd to "storm this shit." Doc. 1-1 at 4-5. After the crowd breached the line of officers, Garcia moved to the Rotunda, where he recorded a video of himself calling for "Nancy" to "come out and play." *Id.* at 6.

Based on his actions on January 6, 2021, Garcia was charged with civil disorder, in violation of 18 U.S.C. § 231(a)(3); obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2); entering and remaining in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(1); disorderly or disruptive conduct in an restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2); disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D); and parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G). Garcia has now moved to transfer venue in this case to the Southern District of Florida or, alternatively, to select a jury from a venire drawn from the Eastern District of Virginia or the District of Maryland. Doc. 54. He contends that prejudice should be presumed in this district for four primary reasons: (1) the political makeup of the District of Columbia jury pool; (2) the impact that January 6 had on the District; (3) pretrial publicity, including statements by government officials; and (4) the results of an opinion poll conducted by John Zogby Strategies. Doc. 54 at 5-13.

## ARGUMENT

The Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. Const. Art. III, § 2, cl. 3. The Sixth Amendment similarly guarantees the right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. Amend. VI. "The provision for trial in the vicinity of the crime is a safeguard against the unfairness and hardship involved when an accused is

prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958).  Transfer to another venue is constitutionally required only where "extraordinary local prejudice will prevent a fair trial."  *Skilling v. United States*, 561 U.S. 358, 378 (2010); *see* Fed. R. Crim. P. 21(a) (requiring transfer to another district if "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there").

The primary safeguard of the right to an impartial jury is "an adequate *voir dire* to identify unqualified jurors."  *Morgan v. Illinois*, 504 U.S. 719, 729 (1992).  The best course when faced with a pretrial publicity claim is ordinarily "to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity."  *United States v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc).  "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire."  *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (en banc) (per curiam).  And, after voir dire, "it may be found that, despite earlier prognostications, removal of the trial is unnecessary."  *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).

I.     **The District of Columbia's Political Makeup Does Not Support a Presumption of Prejudice.**

Garcia contends that he cannot obtain a fair trial in the District of Columbia because it "is the least diverse political population in the country," in which "[a]pproximately 93% of voters . . . voted against Donald Trump."  Doc. 54 at 5; *see id.* at 5-6 (citing a national poll finding that Democrats were more likely to hear about the Capitol attack than Republicans and arguing that the jury pool would be composed of "those who voted nearly unanimously against Donald Trump").  The en banc D.C. Circuit rejected a nearly identical claim in *Haldeman*, where the dissent concluded that a venue change was required because "Washington, D.C. is unique in its overwhelming concentration of supporters of the Democratic Party" and the Democratic candidate

3

received 81.8% and 78.1% of the vote when Nixon ran for President in 1968 and 1972, respectively. *Haldeman*, 559 F.2d at 160 (MacKinnon, J., concurring in part and dissenting in part). The majority rejected the relevance of this fact, observing that authority cited by the dissent gave no "intimation that a community's voting patterns are at all pertinent to venue." *Id.* at 64 n.43; *see also United States v. Chapin*, 515 F.2d 1274, 1286 (D.C. Cir. 1975) (rejecting the argument that "because of [the defendant's] connection with the Nixon administration and his participation in a 'dirty tricks' campaign aimed at Democratic candidates and with racial overtones, a truly fair and impartial jury could not have been drawn from the District's heavily black, and overwhelmingly Democratic, population").

If "the District of Columbia's voting record in the past two presidential elections" is not "at all pertinent to venue" in a case involving high-ranking members of a presidential administration, *Haldeman*, 559 F.2d at 64 n.43, it cannot justify a change of venue here. To be sure, *some* potential jurors might be unable to be impartial in January 6 cases based on disagreement with the defendants' political aims. But whether individual prospective jurors have such disqualifying biases can be assessed during voir dire. This Court should not presume that every member of a particular political party is biased simply because this case has a political connection. Indeed, the Supreme Court has stated in the context of an election-fraud trial, that "[t]he law assumes that every citizen is equally interested in the enforcement of the statute enacted to guard the integrity of national elections, and that his political opinions or affiliations will not stand in the way of an honest discharge of his duty as a juror in cases arising under that statute." *Connors v. United States*, 158 U.S. 408, 414 (1895). The same is true here. The District's voting record does not establish that this Court will be unable to select "an unbiased jury capable of basing its verdict solely on the evidence introduced at trial." *Haldeman*, 559 F.2d at 70.

To the contrary, as the nation's capital and seat of the federal government, the District has been home to its fair share of trials in politically charged cases.  High-profile individuals strongly associated with a particular party, such as Marion Barry, John Poindexter, Oliver North, Scooter Libby, and Roger Stone, have all been tried in the District.  *See United States v. Barry*, 938 F.2d 1327 (D.C. Cir. 1991); *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991); *United States v. North*, 910 F.2d 843 (D.C. Cir. 1990) (per curiam); *United States v. Libby*, 498 F. Supp. 2d 1 (D.D.C. 2007); *United States v. Stone*, No. 19-CR-0018 (ABJ), 2020 WL 1892360 (D.D.C. Apr. 16, 2020).  Indeed, the Court in *Stone* rejected the argument that jurors "could not possibly view [Roger Stone] independently from the President" because of his role in the presidential campaign or that "if you do not like Donald Trump, you must not like Roger Stone."  2020 WL 1892360, at *30-31.  Similarly here, the fact that most District residents voted against Donald Trump does not mean those residents could not impartially consider the evidence against those charged in connection with the events on January 6.

## II.   The Impact of January 6 on Washington D.C. Does Not Support a Presumption of Prejudice.

Garcia also suggests that a D.C. jury could not be impartial because D.C. residents have been particularly affected by events surrounding January 6, including the deployment of the National Guard, the mayor's declaration of a state of emergency, road closures, and a curfew.[1] Doc. 54 at 8.  But January 6 is now more than a year in the past.  Many D.C. residents do not live

---

[1] Garcia states that the curfew lasted "for weeks," Doc. 54 at 8, but that is incorrect. Although the state of emergency lasted 15 days, the curfew lasted only for 12 hours.  *Compare* Press Release, Mayor Bowser Orders Citywide Curfew Beginning at 6pm Today (Jan. 6, 2021), https://mayor.dc.gov/release/mayor-bowser-orders-citywide-curfew-beginning-6pm-today,  *with* Press Release, Mayor Bowser Issues Mayor's Order Extending Today's Public Emergency for 15 Days  (Jan  6,  2021),  https://mayor.dc.gov/release/mayor-bowser-issues-mayor%E2%80%99s-order-extending-today%E2%80%99s-public-emergency-15-days-a1.

or work near the Capitol where the roads were closed and the National Guard was deployed. There is no reason to believe that the District's entire population of 700,000 people was so affected by these events that the Court cannot seat an impartial jury here.

Indeed, courts routinely conclude that defendants can receive a fair trial in the location where they committed their crimes, despite the fact that some members of the community were victimized. *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (Boston Marathon bombing); *Skilling*, 561 U.S. at 399 (Enron collapse); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (September 11, 2001 attacks, including on the Pentagon). In *Skilling*, the Supreme Court rejected the contention that Enron's "sheer number of victims" in the Houston area "trigger[ed] a presumption of prejudice." *Skilling*, 561 U.S. at 384 (quotation omitted). "Although the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron," the voir dire was "well suited to that task." *Id.* In this case too, voir dire can adequately identify those D.C. residents who were so affected by January 6 that they cannot impartially serve as jurors. There is no reason to presume prejudice.

## III.   The Pretrial Publicity Related to January 6 Does Not Support a Presumption of Prejudice in This District.

Garcia also contends that prejudice should be presumed based on pretrial publicity, including coverage of statements by public officials. Doc. 54 at 4-5, 9-12. "The mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity." *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995); *see Murphy v. Florida*, 421 U.S. 794, 799 (1975) (juror exposure to "news accounts of the crime with which [a defendant] is charged" does not "alone presumptively deprive[] the defendant of due process"). Indeed, "every case of public interest is almost, as a matter of necessity, brought

to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits." *Reynolds v. United* States, 98 U.S. 145, 155-56 (1878). Thus, the "mere existence of any preconceived notion as to the guilt or innocence of an accused, without more," is insufficient to establish prejudice. *Irvin v. Dowd*, 366 U.S. 717, 723 (1961). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*

The Supreme Court has recognized only a narrow category of cases in which prejudice is presumed to exist without regard to prospective jurors' answers during voir dire. *See Rideau v. Louisiana*, 373 U.S. 723 (1963). In *Rideau*, the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people. *Id.* at 724 (majority opinion), 728-29 (Clark, J., dissenting). The Court concluded that, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder." *Rideau*, 373 U.S. at 726. Thus, the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire," that these "kangaroo court proceedings" violated due process. *Id.* at 726-27.

Since *Rideau*, the Supreme Court has emphasized that a "presumption of prejudice . . . attends only the extreme case," *Skilling*, 561 U.S. at 381, and the Court has repeatedly "held in other cases that trials have been fair in spite of widespread publicity," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976). In the half century since *Rideau*, the Supreme Court has never presumed prejudice based on pretrial publicity. *But see Estes v. Texas*, 381 U.S. 532 (1965)

(presuming prejudice based on media interference with courtroom proceedings); *Sheppard v. Maxwell*, 384 U.S. 333 (1966) (same).  In fact, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history.  *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam) (capital prosecution of Boston Marathon bomber); *Skilling*, 561 U.S. at 399 (fraud trial of CEO of Enron Corporation); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (trial of participant in 1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (terrorism prosecution for conspirator in September 11, 2001 attacks); *Haldeman*, 559 F.2d at 70 (Watergate prosecution of former Attorney General John Mitchell and other Nixon aides).

In *Skilling*, the Supreme Court considered several factors in determining that prejudice should not be presumed where former Enron executive Jeffrey Skilling was tried in Houston, where Enron was based.  *Skilling*, 561 U.S. at 382-83.  First, the Court considered the "size and characteristics of the community."  *Id.* at 382.  Unlike *Rideau*, where the murder "was committed in a parish of only 150,000 residents," Houston was home to more than 4.5 million people eligible for jury service.  *Id.* at 382.  Second, "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight."  *Id.*  Third, "over four years elapsed between Enron's bankruptcy and Skilling's trial," and "the decibel level of media attention diminished somewhat in the years following Enron's collapse."  *Id.* at 383.  "Finally, and of prime significance, Skilling's jury acquitted him of nine insider-trading counts," which undermined any "supposition of juror bias."  *Id.*

Although these *Skilling* factors are not exhaustive, courts have found them useful when considering claims of presumptive prejudice based on pretrial publicity.  *See, e.g.*, *In re Tsarnaev*,

780 F.3d at 21-22; *United States v. Petters*, 663 F.3d 375, 385 (8th Cir. 2011). And contrary to Garcia's contention (Doc. 54 at 5-13), those factors do not support a presumption of prejudice in this case.

### A.      Size and characteristics of the community

Garcia first asserts that Washington, D.C. "is a relatively small community, with a population of about 700,000 and an estimated potential jury pool of less than 500,000." *Id.* at 5. Although this district may be "small" relative to many other federal judicial districts, it has a larger population than two states (Wyoming and Vermont), and more than four times as many people as the parish in *Rideau*. The relevant question is not whether the District of Columbia is as populous as the Southern District of Texas, but whether it is large enough that an impartial jury can be found. In *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991), the Court cited a county population of 182,537 as supporting the view than an impartial jury could be selected. And *Skilling* approvingly cited a state case in which there was "a reduced likelihood of prejudice" because the "venire was drawn from a pool of over 600,000 individuals." *Skilling*, 561 U.S. at 382 (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991)). There is simply no reason to believe that, out of an eligible jury pool of around half a million, "12 impartial individuals could not be empaneled." *Id.*

### B.      Nature of the pretrial publicity

Nor does this case involve a "confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382. Garcia asserts that "it is impossible for local jurors to reach a fair and impartial verdict" because "District residents have been bombarded with wall-to-wall coverage of the January 6 events, related arrests, criminal charges, and . . . prosecutorial outcomes." Doc. 54 at 7-8. But even "massive" news coverage of a crime does not require prejudice to be presumed. *Haldeman*,

559 F.2d at 61.  And much of the news coverage relating to January 6 has been national in scope. *Id.* at 64 n.43 (observing that "a change of venue would have been of only doubtful value" where much of the news coverage was "national in [its] reach" and the crime was of national interest). Garcia has not established that news media exposure is significantly different in other jurisdictions.

Garcia argues that prejudice should be presumed based on statements by the President, Vice President, Attorney General of the United States, and other political leaders.  Doc. 54 at 3, 8-10.  He points for example, to the President's description of those who stormed the Capitol as "a group of thugs, insurrectionists, political extremists, and white supremacists"; the Vice President's comparison of January 6 to September 11 or December 7, 1941; and the Attorney General's description of January 6 as "a heinous attack that sought to disrupt a cornerstone of our democracy."[2]  *Id.* at 8-9.  But harsh condemnation of a defendant's actions is not uncommon in high-profile criminal cases, and it does not suffice to establish prejudice.  In *Skilling*, the news stories about the defendant's involvement in Enron's collapse "were not kind," but they "contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight."  *Skilling*, 561 U.S. at 382.  And in *Haldeman*, although some of the coverage of the Watergate scandal was "hostile in tone and accusatory in content," the bulk of the coverage "consist[ed] of straightforward, unemotional factual accounts of events and

---

[2] Garcia also quotes the Attorney General as saying that "there was a line that connected the January insurrection to the Oklahoma City bombing and back to the battles of the original Justice Department against the Ku Klux Klan."  Doc. 54 at 3.  In fact, this statement came not from the Attorney General, but from a news article characterizing the now-Attorney General's testimony at his confirmation hearing.  *See* BuzzFeedNews, "Merrick Garland Pledged to Investigate the Capitol Insurrection from the Rioters on 'Up' as Attorney General," (Feb. 22, 2021), available at, https://www.buzzfeednews.com/article/zoetillman/merrick-garland-investigate-capitol-riots-attorney-general; *compare* Statements of Merrick Brian Garland, Hearing Before the U.S. Senate Committee on the Judiciary (Feb. 22, 2021), available at https://www.judiciary.senate.gov/imo/media/doc/SJC%20Testimony.final1.pdf.

of the progress of official and unofficial investigations." *Haldeman*, 559 F.2d at 61.  The D.C.

Circuit concluded that the coverage "was neither as inherently prejudicial nor as unforgettable as

the spectacle of Rideau's dramatically staged and broadcast confession." *Id.*  The same is true

here, where news coverage has not reported on any confession or other blatantly prejudicial

information about Garcia.  And, again, statements by the President and Attorney General are

ordinarily reported across the entire country, and exposure to these statements is hardly unique to

Washington, D.C.

Garcia claims that he has been "more vilified than other individuals charged" in connection

January 6.  Doc. 54 at 11.  But he fails to cite any news stories that have singled him out for

vilification beyond other January 6 defendants.  Garcia is one of more than 770 defendants—and

more than 25 Proud Boys members—charged in connection with January 6, and it appears that he

has not received substantial coverage in national or D.C. news media.[3]  The fact that "he ran in the

primary in 2020 . . . for Florida house of Representatives in District 116" suggests that his is better

known in Florida than in Washington, D.C., which cuts against his request to transfer venue to the

Southern District of Florida.  And the mere fact that he is "the second highest retired officer that

---

[3] For example, Garcia's name appears in only one Washington Post article over the last 13 months, in three CNN articles (that also discussed other defendants), and in no articles on Fox News.  *See* Washington Post, "An alleged Capitol rioter says his ankle monitor beeps too loudly. He wants a judge to let him remove it." (Sep. 10, 2021), available at https:// www.washingtonpost.com/nation/2021/09/10/capitol-rioter-ankle-monitor-beeping/;  CNN,  "In Capitol riot cases, judges split on whether to keep defendants in jail before trial," (Feb. 19, 2021), available at https://www.cnn.com/2021/02/19/politics/capitol-riot-defendants-detention-release/ index.html; CNN, "Disproportionate number of current and former military personnel arrested in Capitol attack, CNN analysis shows," (Feb. 4, 2021), available at https://www.cnn.com/ 2021/01/31/us/capitol-riot-arrests-active-military-veterans-soh/index.html;  CNN,  "Federal prosecutors top 180 Capitol riot cases, with man seen in 'American Supremacist' sweatshirt among the  latest,"  (Feb.  3,  2021),  available  at  https://www.cnn.com/2021/02/03/politics/ capitol-riot-investigation-180-cases/index.html.

serviced in the military" who has been charged in connection with January 6 is hardly a reason to presume prejudice.  Doc. 54 at 11.

### C.    Passage of time before trial

In *Skilling*, the Court considered the fact that "over four years elapsed between Enron's bankruptcy and Skilling's trial."  *Skilling*, 561 U.S. at 383.  In this case, 13 months have already elapsed since the events of January 6, and more time will elapse before trial.  This is far more than in *Rideau*, where the defendant's trial came two months after his televised confession.  *Rideau*, 373 U.S. at 724.  Although Garcia is correct that January 6 continues to be in the news, Doc. 54 at 12, the "decibel level of media attention [has] diminished somewhat," *Skilling*, 561 U.S. at 383.  Moreover, very few (if any) of the recent stories have mentioned Garcia himself, and much of the reporting has been national is scope, rather than limited to Washington, D.C.

### D.    The jury verdict

Because Garcia has not yet gone to trial, the final *Skilling* factor—whether the "jury's verdict . . . undermine[s] in any way the supposition of juror bias," *Skilling*, 561 U.S. at 383—does not directly apply.  But the fact that *Skilling* considered this factor to be "of prime significance," *id.*, underscores how unusual it is to presume prejudice before trial.  Ordinarily, a case should proceed to trial in the district where the crime was committed, and courts can examine after trial whether the record supports a finding of actual or presumed prejudice.  In short, none of the *Skilling* factors support Garcia's contention that the Court should presume prejudice and order a transfer of venue without even conducting voir dire.

## IV.    The Zogby Poll Does Not Support a Presumption of Prejudice.

Garcia also relies extensively on a venue survey conducted by John Zogby Strategies.  Doc. 54 at 1-2, 5-6, 11-14.  Courts have repeatedly refused to find a presumption of prejudice based on

pretrial polling alone.  There are reasons to question the poll's accuracy.  And, even accepting the poll's results, they do not demonstrate that "12 impartial individuals could not be empaneled" in Washington, D.C.  *Skilling*, 561 U.S. at 382.

> **A.      Courts have repeatedly declined to find a presumption of prejudice based on pretrial polling without conducting voir dire**

Garcia argues that the Zogby poll demonstrates such "extreme community prejudice" that "the venire must be presumed to be tainted—and that no voir dire can[] remedy or mitigate this extreme level of prejudice."  Doc. 54 at 2.  But "courts have commonly rejected such polls as unpersuasive in favor of effective voir dire as a preferable way to ferret out any bias."  *United States v. Causey*, 2005 WL 8160703, at *7 (S.D. Tex. 2005).  As one circuit has observed, the Supreme Court's emphasis on the important role of voir dire in addressing pretrial publicity "undercuts" the "argument that poll percentages . . . decide the question of a presumption of prejudice."  *Tsarnaev*, 780 F.3d at 23; *see Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991) (observing that, "[p]articularly with respect to pretrial publicity, . . . primary reliance on the judgment of the trial court makes good sense").

Indeed, the D.C. Circuit has rejected a claim of presumed prejudice based on the results of a pre-voir dire survey.  *Haldeman*, 559 F.2d at 64.  In *Haldeman*, seven former Nixon administration officials (including the former Attorney General of the United States) were prosecuted for their role in the Watergate scandal.  *Id.* at 51.  According to a poll commissioned by the defense in that case, 93% of the Washington, D.C. population knew of the charges against the defendants and 61% had formed the opinion that they were guilty.  *Id.* at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part).  Recognizing that the case had produced a "massive" amount of pretrial publicity, the D.C. Circuit nevertheless held that the district court "was correct" to deny the defendants' "pre-voir dire requests for . . . a change of venue."  *Id.* at

63-64.  The court observed that the district court "did not err in relying less heavily on a poll taken in private by private pollsters and paid for by one side than on a recorded, comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel."  *Id.* at 64 n.43.

Other circuits have similarly rejected attempts to elevate polling results over voir dire.  In *United States v. Campa*, a pre-trial survey found that 69% of respondents were prejudiced against anyone charged with spying on behalf of Cuba, as the defendants were.  *Campa*, 459 F.3d at 1157 (Birch, J., dissenting).  The en banc Eleventh Circuit affirmed the denial of a motion for change of venue, explaining that "[w]hen a defendant alleges that prejudicial pretrial publicity would prevent him from receiving a fair trial, it is within the district court's broad discretion to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *Id.* at 1146 (majority opinion).

Similarly, in *United States v. Rodriguez*, 581 F.3d 775 (8th Cir. 2009), a poll indicated that 99 percent of respondents had heard about the brutal rape and murder with which the defendant was charged, nearly 88 percent of those respondents believed he was guilty, and about 42 percent of respondents had a strongly held opinion of his guilt.  *Id.* at 786; Brief for the Appellant, *United States v. Rodriguez*, No. 07-1316 (8th Cir.), 2008 WL 194877, at *19.  Nonetheless, the Eighth Circuit found no presumption of prejudice, observing that a district court was not required "to consider public opinion polls when ruling on change-of-venue motions."  *Rodriguez*, 581 F.3d at 786.  And the court held that, in any event, the poll did not "demonstrate widespread community prejudice" because the "media coverage had not been inflammatory," two years had passed since the murder, and "the district court concluded that special voir dire protocols would screen out prejudiced jurors."  *Id.*

14

There are good reasons to rely on voir dire, rather that public-opinion polls, when assessing whether prejudice should be presumed.  First, polling lacks many of the safeguards of court-supervised voir dire, including the involvement of both parties in formulating the questions. Surveys that are not carefully worded and properly conducted can produce misleading results, such as by asking leading questions or providing the respondents with facts that will influence their responses.  *See Campa*, 459 F.3d at 1146 (noting problems with "non-neutral" and "ambiguous" questions).  Second, polling lacks the formality that attends in-court proceedings under oath, and it does not afford the court the "face-to-face opportunity to gauge demeanor and credibility." *Skilling*, 561 U.S. at 395.  Third, polls ordinarily inform the court only the extent to which prospective jurors have heard about a case and formed an opinion about it.  But that is not the ultimate question when picking a jury.  A prospective juror is not disqualified simply because he has "formed some impression or opinion as to the merits of the case."  *Irvin*, 366 U.S. at 722. Instead, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."  *Id.* at 723.  But pre-trial surveys are poorly suited to answering that ultimate question, which is best asked in the context of face-to-face voir dire under oath.  *See Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (observing that the trial judge's function in voir dire "is not unlike that of the jurors later in the trial" because "[b]oth must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions").

In sum, federal courts have shown an overwhelming preference for assessing prejudice through court-supervised voir dire rather than through public opinion polls.  And Garcia has not offered any reason to depart from that usual practice here.  Thus, this Court need not give substantial weight to the polling when considering whether to presume prejudice.  But, as

explained below, the Zogby poll does not support a presumption of prejudice in any event.

**B.      The Zogby poll is unreliable.**

There are particular reasons to doubt the reliability of the Zogby poll that Garcia provided.

For one thing, the poll does not provide the Court with all the information needed to assess its

accuracy.  The American Society of Trial Consultants' Professional Standards for Venue Surveys

state the following:

> The trial consultant's presentation of survey results to a court shall include [t]he
> questionnaire that was used in the survey, identification of the primary persons
> who performed the work (including their qualifications), and descriptions of how
> each of the following standard steps for conducting a survey was completed:
> - Design of the survey instrument.
> - Determination of eligibility and sampling measures.
> - Training of interviewers and supervisors to conduct the interviewing.
> - Interviewing procedures.
> - Dates of data collection.
> - Calculation of sample completion rate.
> - Tabulation of survey data.

American Society of Trial Consultants (ASTC), Professional Standards for Venue Surveys at 7,

available at https://www.astcweb.org/Resources/Pictures/Venue%2010-08.pdf.

The Zogby poll fails to provide critical information, such as how the 400 survey

participants were selected for the "online survey" and whether they self-selected.  Doc. 54-1 at 2.

*See United States v. Thomley*, No. 2:18-CR-18-KS-MTP, 2018 WL 5986754, at *2 (S.D. Miss.

Nov. 14, 2018) ("The Court is . . . troubled by [the polling firm's] failure to explain *how* they

selected their sample. Did they obtain responses online or via social media? Did respondents self-

select?").  Additionally, the explanation that is provided indicates that the poll was underinclusive,

in that it was only of "Washington DC registered voters," Doc. 54-1 at 2, whereas this Court's jury

pool is generated based on voter registration, Department of Motor Vehicles records, and D.C.

income tax forms.  Jury Selection Plan for the United States District Court for the District of

Columbia for the Random Selection of Grand and Petit Jurors at 1, available at https://www.dcd.uscourts.gov/sites/dcd/files/JurySelectionPlan2016.pdf.

Moreover, the Zogby poll uses a number of compound, non-neutral, and leading questions. *See Campa*, 459 F.3d at 1131-32, 1146 (affirming district court's decision to reject venue survey that used "ambiguous" and "non-neutral" questions).  For example, Question 8 asked respondents which description of January 6 "comes closer to your opinion," giving options only for (A) "a dire threat to the fabric of our nation and . . . the worst assault on US democracy since 9/11, Pearl Harbor, or even the Civil War" or (B) "unwise and caused senseless damage to the Capitol building and people's lives, some of which were lost, but the events were not insurrectionist and did not pose a threat to US democracy."  Doc. 54-1 at 21, 40.  These answers, in addition to being compound, forced respondents into a binary choice between extreme options.  For example, there was no choice for someone who believed the events *did* pose a threat to U.S. democracy but did not approach the level of 9/11, Pearl Harbor, or the Civil War.  Nor was there a choice for someone who believed the events did *not* pose a threat to U.S. democracy but was also unwilling to describe them as "unwise" or "senseless."

The survey's next question asked whether respondents believed that "any individual who was inside the US Capitol on January 6, 2021 should be convicted of insurrection."  Doc. 54-1 at 22, 40.  This question is poorly worded, considering that hundreds of "individual[s] who w[ere] inside the US Capitol on January 6" had every right to be there, including the Vice President, the members of Congress, and the U.S. Capitol Police and U.S. Secret Service.  Moreover, the question provided no background on potential criminal offenses involved in the events of January 6 other than "insurrection"—which the question does not define or describe, *see* 18 U.S.C. § 2383, and with which no defendant has been charged in connection with the events of January 6.  And the

setup for this question naturally prompted respondents to condemn the actions of January 6 rather than to consider whether they actually believed everyone who entered the Capitol without permission was an insurrectionist.  In short, these questions have the earmarks of an inappropriate "push poll" that is "primarily designed to influence survey respondents' opinions in a particular direction by presenting systematically biased information."  ASTC Professional Standards for Venue Surveys at 7; *see id.* at 8 ("Efforts should be made to avoid context, wording or other influences that raise the likelihood of responses due to social desirability or other response bias."); *Campa*, 459 F.3d at 1146 (observing that "the survey was riddled with non-neutral questions").

The poll's executive summary also misstates the poll's own findings.  For example, it claims that "[n]early 3 out of 4 respondents (73%) believe that any individual who was inside the Capitol on January 6, 2021 should be convicted of insurrection."  Doc. 54-1 at 3.  In fact, the detailed findings show that 73% of those *who were "Very familiar" or "Somewhat familiar" with January 6* held this belief.  *Id.* at 19, 22.  The claim fails to account for the 5% of respondents who answered "Not familiar/Not sure" when asked about their familiarity with January 6.  *Id.* at 19. The executive summary also states that "Close to 9 out of 10 respondents (88%) who are familiar with Mr. Garcia, felt that if he were shown to have been inside the Capitol building on January 6, 2021 he should be convicted of obstruction of justice and civil disorder."  *Id.* at 3 (removing emphasis).  Again, however, it was not 88% of "respondents . . . familiar with Garcia" who held this belief, but rather 88% of respondents familiar with (a) the events of January 6, (b) the Proud Boys, and (c) Garcia.  *Id.* at 19, 23, 27.  This represented only 31% (125 of 401) of the poll's total respondents.  The executive summary omits important qualifiers when reciting the poll's findings, further calling into question its reliability.

In addition, the Zogby poll is particularly unhelpful in determining whether transfer is warranted because it fails to provide a comparison with Garcia's preferred venue (the Southern District of Florida) or any other district.  For example, the fact that 72% of D.C. respondents thought individuals inside the Capitol on January 6 should "be convicted of insurrection" is not helpful for a venue analysis unless the Court knows how many potential jurors in other districts think the same.  This is particularly true considering that 54% of respondents indicated their views about January 6 were shaped more by national media sources, compared to only 39% that were shaped by more local media sources.  Doc. 54-1 at 5.  *See Haldeman*, 559 F.2d at 64 n.43 (observing that "a change of venue would have been of only doubtful value" where much of the news coverage was "national in [its] reach" and the crime was of national interest).  Indeed, Garcia may be *less* well known in Washington, D.C. than in the Southern District of Florida, where he has previously run for state representative.

### C.     The Zogby poll does not indicate insurmountable bias in any event.

Even if the Zogby poll's results are taken at face value, the poll does not support a presumption of prejudice in this district.  The poll indicates that 67% of respondents were "[v]ery familiar" with the events of January 6, 28% were "[s]omewhat familiar," and only 5% were "[n]ot familiar/[n]ot sure."  Doc. 54-1 at 19.  But "[p]rominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*."  *Skilling*, 561 U.S. at 381.  And courts have found no presumption of prejudice with similar levels of familiarity.  *See Patton v. Yount*, 467 U.S. 1025, 1029 (1984) (all but two members of a 163-person venire (or 98.8%) had heard of the case); *Haldeman*, 559 F.2d at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part) (93% of surveyed D.C. residents were aware of charges against former Nixon aides).  So, contrary to Garcia's suggestion (Doc. 54 at 2, 13), this level of familiarity does not raise a presumption of

prejudice.

Garcia asserts that "73% of respondents believed that anyone who merely entered the Capitol building on [January 6] is guilty of insurrection." Doc. 54 at 1, 5. In fact, the Zogby poll showed that 73% of respondents who were "Very familiar" or "Somewhat familiar" with January 6 held this belief. Doc. 54-1 at 22 (277 of 380 respondents). When respondents who were "Not familiar/Not sure" are taken into account, the percentage falls to 69%. *Id.* at 19, 22 (277 of 401 respondents). And this does not raise a presumption of prejudice. In *Patton v. Yount*, nearly 99% of prospective jurors had heard of the case, and 77% indicated on voir dire that "they would carry an opinion into the jury box," yet the Supreme Court rejected a claim of presumed prejudice. *Patton*, 467 U.S. at 1029. Thus, the number of poll respondents who had formed a general opinion about January 6 defendants was lower than in *Patton*, even though the Zogby poll did not ask respondents whether they could set aside their opinions and determine guilt based solely on the evidence if called as jurors. *Compare Haldeman*, 559 F.2d at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part) (61% of survey respondents held the opinion that defendants were "guilty" in connection with Watergate even when provided a survey option for "Not Guilty Until Proven"). At most, these responses indicate the Court might have to call a somewhat larger venire in order to find 12 impartial jurors; they do not demonstrate that it is impossible to pick an unbiased jury.

Garcia also asserts that "88% of registered D.C. voters believe that if Garcia went inside the Capitol building on January 6 . . . he should be convicted of obstruction of justice and civil disorder." Doc. 54 at 1 (footnote omitted).[4] In fact, the Zogby poll shows that this belief was held

---

[4] As with the question about "insurrection," the question makes no effort to inform respondents about what is required for the government to prove the relevant criminal offenses. *See* 18 U.S.C. § 1512(c)(2) (obstruction of justice); 18 U.S.C. § 231(a)(3) (civil disorder).

by 125 (88%) of the 143 respondents who were (a) familiar with the events of January 6 *and* (b) familiar with the Proud Boys *and* (c) familiar with Garcia himself.  Doc. 54-1 at 27 (125 of 143).  When the respondents who lacked this familiarity are accounted for, the percentage of overall respondents believing Garcia should be convicted if he entered the Capitol falls to 31%. *Id.* at 19, 27 (125 of 401).  That is hardly sufficient to support a presumption of prejudice.

Garcia discusses a variety of other findings from the Zobgy poll, many of them variations on the findings just discussed.  Doc. 54 at 1, 11-14.  But all these findings suffer from the same flaw—they fail to show a level of bias against Garcia so high that this Court can presume prejudice, forgo voir dire, and transfer venue to another jurisdiction.  In fact, the Zogby poll demonstrates that nearly two-thirds of D.C. voters are unfamiliar with Garcia, undermining any claim that prejudice against Garcia is pervasive in the District.  *See* Doc. 54-1 at 19, 26 (143 of the 401 total respondents said they were "familiar with the Proud Boys organization member named Gabriel Garcia").

In any U.S. jurisdiction, most prospective jurors will have heard about the events of January 6, and many will have various disqualifying biases.  But the appropriate way to identify and address those biases is through a careful voir dire, rather than a change of venue based solely on pretrial polling and media analyses.  As in *Haldeman*, there is "no reason for concluding that the population of Washington, D. C. [i]s so aroused against [the defendant] and so unlikely to be able objectively to judge [his] guilt or innocence on the basis of the evidence presented at trial" that a change of venue is required.  *Haldeman*, 559 F.2d at 62.

## <u>CONCLUSION</u>

For the foregoing reasons, the defendant's motion to transfer venue should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   _/s/ Angela N. Buckner_
Angela N. Buckner
DC Bar #1022880
Assistant United States Attorney
United States Attorney's Office
555 Fourth Street, N.W.
Washington, DC 20530
Phone: (202) 252-2656