UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | CASE NO. 21-CR-129 (ABJ) |
| v. : | |
| : | |
| GABRIEL GARCIA, : | |
| also known as "Gabriel Agustin Garcia" : | |
| : | |
| Defendant. : | |

### GOVERNMENT'S SURREPLY TO DEFENDANT'S MOTION TO TRANSFER VENUE

Defendant Gabriel Garcia, who is charged in connection with events at the U.S. Capitol on January 6, 2021, moves for transfer of venue, stating in his reply that he faces "such an extreme level of prejudice" in this district that venue must be transferred in advance of voir dire. *See* Dkt. No. 65 at 1. Garcia again fails to establish that he "cannot obtain a fair and impartial trial" in this district, Fed. R. Crim. P. 21(a), and this Court should deny his motion.

### RELEVANT BACKGROUND

On February 1, 2022, Garcia filed a motion to change venue, arguing that prejudice should be presumed in this district for four primary reasons: (1) the political makeup of the District of Columbia jury pool; (2) the impact that January 6 had on the District; (3) pretrial publicity, including statements by government officials; and (4) the results of an opinion poll conducted by John Zogby Strategies. *See* Dkt. No. 54 at 5-13.

On February 10, 2022, this Court granted the government's unopposed motion for extension of time, and on February 28, 2022, the government filed its opposition. *See* Dkt. No. 61.

On March 18, 2022, Garcia filed his reply to the government's opposition, attaching a new jury survey and arguing that his affiliation with the Proud Boys warrants, "as a matter of law," the

1

"rare presumption of prejudice to grant a change of venue before voir dire." Dkt. No. 65 at 4 (internal citations omitted).

On March 23, the Court ordered the government to file a surreply addressing anything new in the reply and, "in particular, the new survey upon which the defendant now relies." March 23, 2022 Minute Order.

## ARGUMENT

As explained in the government's initial opposition, the constitutional presumption is that a criminal case shall be tried in State and district where the crime was committed. U.S. Const. Art. III, § 2, cl. 3; Amend. VI. Transfer to another venue is appropriate only where "extraordinary local prejudice will prevent a fair trial." *Skilling v. United States*, 561 U.S. 358, 396 (2010). A "presumption of prejudice" warranting a change of venue, however, "attends only the extreme case." *Id.* at 381. And neither in his initial motion nor his reply has Garcia come close to demonstrating that "12 impartial individuals could not be empaneled" in Washington, D.C. *Skilling*, 561 U.S. at 382.

**I.     The Select Litigation Poll Does Not Support a Presumption of Prejudice.**

In support of his reply, Garcia briefly cites a survey conducted by Select Litigation, LLC, which compared the responses of prospective jurors in the District of Columbia and the Atlanta Division of the Northern District of Georgia. *See* Dkt. 65-1. Garcia claims that poll's "results and conclusions parallel Zogby's survey." *See* Dkt 65 at 5. Garcia offers little specific analysis of the Select Litigation survey, and that survey does not support finding a presumption of prejudice in the District of Columbia and ordering a change of venue without first conducting voir dire. As explained in the government's opposition, public opinion polls are no substitute for voir dire, and the better course when faced with a pretrial publicity claim is "to proceed to voir dire to ascertain

whether the prospective jurors have, in fact, been influenced by pretrial publicity." *United States v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc).

Moreover, the Select Litigation poll does not support Garcia's motion for a change of venue. As an initial matter, Garcia has not requested a trial in the Atlanta Division of the Northern District of Georgia, but instead requested that this Court "move his trial . . . to the Southern District of Florida" or, alternatively, use "a venire from a neighboring district, such as the Eastern District of Virginia or the District of Maryland." Dkt. No. 54 at 1. The Select Litigation survey tells the Court nothing about the views or media exposure of prospective jurors in those districts. It therefore cannot show that selecting an impartial jury would be any easier if the jury were drawn from one of Garcia's preferred districts. *See United States v. Haldeman*, 559 F.2d 31, 64 n.43 (D.C. Cir. 1976) (en banc) (per curiam) (observing that a change of venue "would have been only of doubtful value" where the pretrial publicity was national in scope).

Furthermore, the poll indicates that levels of media exposure to the events of January 6 are not significantly different in Atlanta than in Washington, D.C. The number of respondents who had seen "[a] lot" of coverage in each jurisdiction differed only by three percentage points (33% in D.C. versus 30% in Atlanta), which is within the margin of error. Dkt. No. 65-1 at 2-3, 15. The number of respondents who had seen "[s]ome" coverage was exactly the same (25% in both jurisdictions), and the number who had seen "[q]uite a bit" of coverage was not significantly different (28% in D.C. versus 20% in Atlanta). *Id.* at 15. The total percentage of respondents who were exposed to "[a] lot," "[q]uite a bit," or "[s]ome" news coverage was 86% in Washington, D.C. and 75% in Atlanta. *Id.* at 15. This relatively small difference does not suggest that news coverage has made it impossible to pick an impartial jury in Washington, D.C.

The survey indicates that 71% of respondents in D.C. said they had formed the opinion that

3

January 6 arrestees were "guilty" of the charges brought against them. *See* Dkt. No. 65-1 at 15. The survey failed, however, to provide respondents with the option of saying they were "unsure" about guilt, even though such an option is required by professional standards that apply in this area. *See* American Society of Trial Consultants, Professional Standards for Venue Surveys at 9, available at https://www.astcweb.org/Resources/Pictures/Venue%2010-08.pdf ("Respondents must be made aware that they can say they do not know or have no opinion."). The survey instead gave respondents a binary choice between "guilty or not guilty." Dkt. No. 65-1 at 15. Yet even without being provided the appropriate options, 26% of D.C. respondents voluntarily gave an answer of "Depends" or "Don't know/Refused." *Id.* This shows that, even in response to a poorly worded question, more than a quarter of the District's residents realized the need to keep an open mind about guilt.

Understood in context, the Select Litigation poll does not indicate any higher degree of juror bias than in *Haldeman*, where the en banc D.C. Circuit found no presumption of prejudice. In *Haldeman*, 61% of respondents expressed a view that the defendants were guilty, as opposed to the 71% here. *See Haldeman*, 559 F.2d at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part). But the survey in *Haldeman* first asked respondents whether they had formed an opinion about whether the indicted Nixon aides were guilty or innocent, giving options for both "No" (*i.e.* had not formed an opinion) and "Don't Know/No Opinion." *Id.* at 178 n.2. The survey then asked whether respondents thought the defendants were "guilty or innocent in the Watergate affair," giving options for "Not Guilty Until Proven" and "No Opinion/Don't Know." *Id.* Only after (a) being prompted to consider whether they could actually form an opinion, and (b) being reminded of the presumption of innocence, did 61% of respondents say "guilty." *Id.* Here, by contrast, respondents were not provided a "don't know" option, were not reminded of the

4

presumption of innocence, and were asked only whether they thought the "several hundred people" arrested in connection with January 6 were "guilty."  Dkt. No. 65-1 at 15 (Questions 3, 4).

When asked about guilt in the context of a criminal trial, however, respondents in the Select Litigation survey were far less likely to give an answer of "guilty." Question 5 asked them to "[a]ssume [they] were on a jury for a defendant charged with crimes for his or her activities on January 6" and then asked whether they were "more likely to vote that the person is guilty or not guilty." Dkt. No. 65-1 at 15. In response to this question, only 52% of D.C. respondents said "Guilty," and fully 46% volunteered a response of "Depends" or "Don't know/Refused." *Id.*  Thus, when asked to consider guilt or innocence in the context of a "defendant charged with crimes," as opposed to the "several hundred people . . . arrested," nearly half of D.C. residents were committed to keeping an open mind—even without being instructed on the presumption of innocence or being provided an option for "Do not know."  This indicates, if anything, a lower degree of prejudice than was present in *Haldeman*.

According to the Select Litigation poll, 84% of D.C. respondents had an "unfavorable" view of "people arrested for participating in the events at the U.S. Capitol on January 6."  65-1 at 15.  Although that is higher than the 54% of Atlantans with unfavorable views, it is quite similar to the results of a nationwide CBS poll, which found that 83% of respondents "[s]omewhat disapprove" or "[s]trongly disapprove" of the "actions taken by the people who forced their way into the U.S. Capitol on January 6."  *See* CBS News Poll, December 27-30, 2021, Question 2, https://drive.google.com/file/d/1QNzK7xBJeWzKlTrHVobLgyFtId9Cgsq_/view.  Garcia has not asked to be tried in Atlanta and has not provided any information about the views in the requested venue.  And, in any event, the fact that many D.C. residents have a generally "unfavorable" view of people "arrested" on January 6 does not mean that an impartial jury cannot be selected in this

5

jurisdiction.

Additionally, 62% of D.C. respondents (compared to 48% of Atlanta respondents) would describe "most of the people who were arrested for their involvement in the events on January 6th" as "criminals." Dkt. No. 65-1 at 15 (Question 10).  The answers to this question likely reflect the commonly held view that most people arrested for crimes are in fact guilty of those crimes.  But the fact that 62% of D.C. respondents expressed this off-the-cuff view about "most" of the 700-plus January 6th arrestees does not demonstrate that all of those respondents would be unable to impartially find the facts in a specific case after being properly instructed by the Court.  Moreover, the question demonstrates that fully 28% of D.C. respondents would *not* describe those arrestees as criminals, and 9% were unsure or refused to answer. Dkt. No. 65-1 at 15. And the 14% difference between D.C. and Atlanta—which could easily be explained by demographic differences such as age and education levels (*see* Dkt. No. 65-1 at 16)—would not justify the conclusion that this is an "extreme case" in which a change of venue is required. *Skilling*, 561 U.S. at 381.

Nor should prejudice be presumed, as Garcia argues, because a substantial numbers of respondents "would" describe "the people who forced their way into the U.S. Capitol" as "[t]rying to overturn the election and keep Donald Trump in power" (85%), engaging in "[i]nsurrection" (76%), or "[t]rying to overthrow the U.S. government" (72%). *See* Dkt. No. 65 at 5-6, 65-1 at 16. For one thing, the poll did not provide an "undecided" option but asked only whether respondents "would" or "would not" use those descriptions. *Id.* For another, the question did not define the offenses of "insurrection" or advocating the overthrow of government, *see* 18 U.S.C. §§ 2383, 2385, offenses with which no defendant has been charged in connection with January 6. And, most importantly, the poll did not answer the key question: whether a sufficient number of prospective

6

jurors can "lay aside [their] impression[s] or opinion[s] and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723 (1961); *see Patton v. Yount*, 467 U.S. 1025, 1029 (1984) (no presumption of prejudice where nearly 99% of prospective jurors had heard of the case and 77% indicated on voir dire that "they would carry an opinion into the jury box"). In short, the Select Litigation poll does not come close to demonstrating that "12 impartial individuals could not be empaneled" in Washington, D.C. *Skilling*, 561 U.S. at 382.

In any U.S. jurisdiction, most prospective jurors will have heard about the events of January 6, and many will have various disqualifying biases. But the appropriate way to identify and address those biases is through a careful voir dire, rather than a change of venue based solely on pretrial polling and media analyses. As in *Haldeman*, there is "no reason for concluding that the population of Washington, D. C. [i]s so aroused against [the defendant] and so unlikely to be able objectively to judge [his] guilt or innocence on the basis of the evidence presented at trial" that a change of venue is required. *Haldeman*, 559 F.2d at 62.[1]

## II. The Select Litigation Media Analysis Does Not Support a Presumption of Prejudice.

The attachment to Garcia's reply includes not only the results of the Select Litigation survey, but also the results of a media analysis conducted by Select Litigation. Garcia fails even to mention this analysis in his reply brief, and any argument based upon it is therefore waived. *See United States v. Johnson*, No. 02-310, 2021 WL 3737681, at *4 (D.D.C. Aug. 24, 2021). But that media analysis does not a presumption of prejudice in any event.

Again, as an initial matter, Garcia has not requested that his trial be moved to the Atlanta

---

[1] To be clear, *Haldeman* did not reject all polling (*see* Dkt. 65 at 12), and the government makes no such argument. Nor does the fact that a survey was conducted "online" automatically invalidate its results. Instead, the Zogby poll fails to provide critical information, such as how the 400 survey participants were selected and whether they self-selected. *See United States v. Thomley*, No. 2:18-CR-18-KS-MTP, 2018 WL 5986754, at *2 (S.D. Miss. Nov. 14, 2018) ("The Court is . . . troubled by [the polling firm's] failure to explain *how* they selected their sample. Did they obtain responses online or via social media? Did respondents self-select?").

7

Division of the Northern District of Georgia. The comparative analysis of media coverage in Atlanta tells the court little, if anything, about the extent of the media coverage in Garcia's preferred venue (the Southern District of Florida) or the other districts from which he alternatively proposes to draw a jury (the Eastern District of Virginia or the District of Maryland). So the media analysis does not support a claim that the jury pools in those districts have been exposed to substantially less media coverage of January 6 than has the jury pool in the District of Columbia

Even as a more general matter, the analysis does not show that media coverage in the District of Columbia has been so extensive as to give rise to a presumption of prejudice. The analysis shows that, in nine of the 13 months analyzed, the Washington Post ran more news stories about January 6 than did the Atlanta Journal-Constitution. Dkt. No. 65-1 at 10. But, for several reasons, these numbers do not demonstrate that media exposure was significantly different in Atlanta than in Washington, D.C. First, the comparison fails to account for the comparative sizes and circulations of the two newspapers. It should not be surprising that a large national newspaper would print more articles on the same topic than a regional newspaper. Second, the analysis does not account for the fact that many Americans receive their news from national sources such as CNN or Fox News, often filtered through social media. Thus, prospective jurors in both Washington, D.C. and Atlanta are not limited to their local newspapers and television broadcast stations and may well have been exposed to much of the same media coverage. Third, simply counting the number of news articles in a given source is not a good way to measure prospective jurors' media exposure. Indeed, the Select Litigation poll shows comparatively small variations in media exposure between Washington, D.C. and Atlanta. According to that poll, 99% of D.C. respondents were aware of the January 6 demonstrations, compared to 93% in Atlanta, and 33% of D.C. respondents had seen "A lot" of coverage, compared to 30% in Atlanta. *Id.* at 15-16. Like

the Watergate scandal at issue in *Haldeman*, the storming of the Capitol on January 6, 2021, was "not a local crime of peculiar interest to the residents of the District of Columbia" but one that generated national interest. *Haldeman*, 559 F.2d at 64 n.43.

The Select Litigation analysis also concludes that "the number of hits from internet sites based in the District of Columbia area was four times higher than the comparable number of hits from sites based in the Atlanta area." Dkt. 65-1 at 10. But the analysis includes no information about where these hits came from. Many of the hits on D.C.-based news sources likely came from readers outside the District itself, such as readers in the Northern Virginia and Maryland suburbs or readers from other parts of the country who were directed to D.C.-based news reporting on social media. A reader in California, for example, would be far more likely to read about January 6 on the Washington Post than on the Atlanta Journal-Constitution. Without additional information, this analysis of Internet hits is essentially meaningless.

The Select Litigation analysis is also unhelpful because it considered only the coverage of January 6 in general, as opposed to the coverage of Garcia. As the government previously argued (Dkt. No. 61 at 11), Garcia is one of more than 770 defendants—and more than 25 Proud Boys members—charged in connection with January 6, and only a fraction of the media coverage has focused on him. Garcia's attempt to bolster his arguments regarding pretrial publicity by citing a civil case, *District of Columbia v. Proud Boys International, L.L.C. et al*, 21-cv-03267 (APM), is unpersuasive, especially where Garcia is not an individually named defendant and where mention of his conduct on January 6 is limited to one page of an 84-page complaint.[2] Indeed, the coverage

---

[2] Furthermore, as to comments made by the Attorney General of the District of Columbia, those comments do not appear to reference Garcia specifically. Regardless, harsh condemnation of a defendant's actions is not uncommon in high-profile criminal cases, and it does not suffice to establish prejudice. In *Skilling*, the news stories about the defendant's involvement in Enron's collapse "were not kind," but they "contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382.

9

of Garcia is less significant than in *Skilling*, where the Houston Chronicle "mentioned Enron in more than 4,000 articles during the 3-year period following the company's December 2001 bankruptcy" with "[h]undreds of these articles discussing Skilling by name." *Skilling*, 561 U.S. at 428 (Sotomayor, J., concurring in part and dissenting in part).

Finally, the media analysis fails to support a presumption of prejudice because mere exposure to pretrial publicity does not disqualify a potential juror. "Prominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*." *Skilling*, 561 U.S. at 381. The Supreme Court has found no presumption of prejudice even when 98% of prospective jurors had heard of the case and 77% indicated on voir dire that "they would carry an opinion into the jury box." *Patton*, 467 U.S. at 1029. The mere fact that Washington, D.C. news outlets have run more stories about January 6 (and received more hits) than have Atlanta outlets does not suggest that an impartial jury cannot be selected in Washington D.C.

## CONCLUSION

For the foregoing reasons, the defendant's motion to transfer venue should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   /s/ Angela N. Buckner
Angela N. Buckner
DC Bar #1022880
Assistant United States Attorney
United States Attorney's Office
555 Fourth Street, N.W.
Washington, DC 20530
Phone: (202) 252-2656