## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| UNITED STATES OF AMERICA, )| |
| ) | |
| v. ) | |
| ) | Crim. Action No. 21-0129 (ABJ) |
| GABRIEL AUGUSTIN GARCIA, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## <u>MEMORANDUM OPINION</u>

> *D.C. is not just a city of dead presidents and cold marble monuments. The people we see working here on our television screens, in the halls of power, and the plush seats of Sunday morning punditry, often have as little to do with the city itself, and the people who actually live here, as any creatures from another universe. This is a city filled with actual living, breathing, eating Americans. Not vessels for one ideology or another, empty suits and empty ideas. Hard lives, hard struggles, and long roads to get here.*[1]

*Anthony Bourdain*

Defendant Gabriel Augustin Garcia has filed a motion that seeks "a change of venue and asks the Court to move his trial outside the District of D.C. to the Southern District of Florida." Mot. to Transfer Venue and Mem. of Law [Dkt. # 54] ("Mot.") at 1. "Alternatively, Garcia requests a venire from a neighboring district, such as the Eastern District of Virginia or the District of Maryland, is used and the trial still be held in the District of Columbia." *Id.* His thesis is that "detrimental pretrial publicity and extreme community prejudice in the District of Columbia . . . are so likely to have affected the jury pool, that the venire must be presumed to be tainted," and he insists that "voir dire cannot remedy or mitigate this extreme level of prejudice." *Id.* at 2. The

---

[1]   *Anthony Bourdain: No Reservations: Washington D.C.* (Travel Channel television broadcast Jan. 19, 2009).

government has opposed the motion, *see* Gov't's Opp. to Mot. [Dkt. # 61] ("Opp."), and the matter is fully briefed.  *See* Def.'s Reply to Opp. [Dkt. # 65] ("Reply"); Gov't's Surreply to Mot. [Dkt. # 66] ("Surreply").

Defendant's initial motion was based on a survey conducted online with 400 registered voters in Washington, D.C. by John Zobgy Strategies, *see* Survey of Washington DC Registered Voters on Opinions Concerning the January 6, 2021 Events at the Capitol Building, Ex. 1 to Mot. [Dkt. # 54-1] ("Zogby Survey"),[2] and he later docketed another survey conducted by Harrison Hickman, who was commissioned by the Office of the Federal Public Defender for Eastern District of Virginia, Reply at 5, that was given to 400 "jury-eligible citizens of the District of Columbia." Ex. A to Reply [Dkt. # 65-1] ("Hickman Survey") at 1.[3]  Shortly after the hearing held on this motion, *see* Min. Entry (April 26, 2022), defendant submitted a third survey which was conducted by In Lux Research and given to "potential jurors" in Washington, D.C. and three other federal districts; "[o]ver 1500 potential jurors were interviewed, yielding over 350 responses from each Test Area."  Ex. A to Notice of Filing Additional Supp. for Mot. [Dkt. # 71-1] ("In Lux Survey").[4]

Defendant's motion is largely predicated on sweeping, unsupported assertions about a city he does not appear to know or understand.  None of the surveys support an assumption that any prejudice against this individual defendant is so great that he cannot receive a fair trial in this district; despite his grandiose claims, there is little evidence that D.C. residents know who he is at

---

2      All citations to the Zogby Survey will be to the PDF page numbers of Exhibit 1.

3      The survey is addressed to the "Federal Public Defender's Office for the Eastern District of Virginia" but then states that it was commissioned by "the Federal Public Defenders' Office for the District of Columbia," so there is some confusion on this point.  Hickman Survey at 1.

4      All citations to the In Lux Survey will be to the PDF page numbers of Exhibit A.

all.  The cases the defendant relies on are either inapposite or tend to weigh against transfer, and

this Court is bound by authority that teaches that voir dire is the proper means for addressing

pretrial publicity and potential juror bias in the first instance.  For these reasons, the motion will

be **DENIED**.

### The Indictment

Gabriel Augustin Garcia is alleged to have been a member of the crowd that overwhelmed

the United States Capitol on January 6, 2021.  *See* Mot. at 2.  On November 10, 2021, a federal

grand jury returned a superseding indictment charging him with the following offenses:

- Count One:   Civil Disorder and Aiding and Abetting in violation of
  18 U.S.C. § 231(a)(3) and (a)(2).

- Count Two:  Obstruction of an Official Proceeding and Aiding and Abetting in
  violation of 18 U.S.C. § 1512(c)(2).

- Count Three:  Entering and Remaining in a Restricted Building or Grounds in
  violation of 18 U.S.C. § 1752(a)(1).

- Count Four:  Disorderly and Disruptive Conduct in a Restricted Building or
  Grounds in violation of 18 U.S.C. § 1752(a)(2).

- Count Five:   Disorderly Conduct in a Capitol Building in violation of
  40 U.SC. § 5104(e)(2)(D).

- Count Six:  Parading, Demonstrating, or Picketing in a Capitol Building in violation
  of 40 U.S.C. § 5104(e)(2)(G).

Ind. [Dkt. # 44].

The Court detailed some of the factual allegations in the case in a previous order, noting

that:

> According to the complaint filed by Special Agent Michael F. Biscardi,
> defendant took videos of himself that day.  Statement of Facts [Dkt. # 1-1]
> ("SOF") at 4.  In one video, defendant turned the camera on himself and
> noted that "We just went ahead and stormed the Capitol. It's about to get
> ugly."  SOF at 4.   The agent described the video as "depict[ing] an

3

aggressive confrontation with U.S. Capitol Police officers, who are trying to prevent the crowd from advancing."  SOF at 3–4.  During the confrontation, defendant is heard shouting at police officers attempting to defend the building:  "You fucking traitors!  You fucking traitors!  Fuck you!"  SOF at 4.  The agent adds that defendant was "holding a large American flag, which he drops into the skirmish in an apparent attempt to assist the individuals who are struggling with the USCP officers."  SOF at 4.

During the standoff, defendant got so close to the officers "that their names are clearly visible in the video."  SOF at 4.  While in that position, he "yell[ed]" that "You ain't stopping a million.  You ain't gonna hold a million back today.  Sorry.  Ain't holding a million of us.  And there's more!"  SOF at 4–5. Shortly after, he shouted "Storm this shit!" two times, as well as shouting "Fucking traitors!" again, asking an officer "How does it feel being a traitor to the country?  How does it feel?" and repeating that "You ain't stopping a million of us."  SOF at 5.  Defendant encouraged the crowd by saying, "Hold the line!" and "Keep 'em coming.  Keep 'em coming."  SOF at 5.  "The last moments captured in the video are of the crowd rushing the USCP officers."  SOF at 5.

Surveillance videos then capture a person, alleged to be the defendant, in the Capitol building.  SOF at 5.  This person "turns the camera on himself, and says, 'Free Enrique,'" which the agent alleges "is an apparent reference to Enrique Tarrio, the Miami-based leader of the right-wing organization the 'Proud Boys,' who was arrested in the District of Columbia on January 4, 2021."  SOF at 6 n.3.  This person also repeatedly called out for "Nancy," saying "Nancy come out and play" and repeating her name several times. SOF at 6–7.  This taunt was presumably meant for Nancy Pelosi, the Speaker of the United States House of Representatives.  Throughout the videos, defendant repeatedly shouted, "whose house?" and "our house!" SOF at 4–7.

Order [Dkt. # 35] at 2–3.

Defendant is from Florida, and he asserts – without pointing to any local news articles or broadcasts in particular[5] – that he has been "more vilified" in the District of Columbia "than other individuals charged in J6."  Mot. at 11.  He posits that he "stands out more in news coverage,

---

5   Defendant advised the Court in his motion that he "intend[ed] to supplement this motion with an analysis of local D.C. media coverage of J6," Mot. at 12 n.30, but he never did so.

because he ran in the primary in 2020 as Republican candidate for Florida House of Representative in District 116." *Id.* He adds – again without pointing to any source for the information – that he has garnered attention because "he is considered the second highest retired officer that served in the military and is charged in J6." *Id.* And, according to the motion, "the media has continually blasted Garcia for being affiliated with the proud boys." *Id.* Garcia devotes a considerable portion of his briefing – and his survey questions – addressing what he characterizes as "[h]is [a]ssociation [w]ith [t]he Proud Boys," pointing out that the District of Columbia has filed a lawsuit against the group and he is named "on paragraph 213, page 58" of the complaint. *Id.*, citing *District of Columbia v. Proud Boys International, L.L.C.*, No. 21-cv-3267; *see also* Reply at 1, 3–5, 9.[6]

### The Surveys

Defendant first submitted a survey undertaken by John Zogby of John Zogby Strategies. *See generally* Zogby Survey.[7] It posed twenty questions and described its methodology as follows:

> John Zogby Strategies was commissioned by Gabriel Garcia's legal team to conduct an online survey of 400 Washington DC registered voters regarding their opinions about the January 6, 2021 events at the Capitol building and sources of media about such events.
>
> The margin of error for the sample of 400 DC registered voters is +/- 5 percentage points from a universe of emails of such registered voters.
>
> Each invitation for this survey was password coded and secured so the IP addresses were not tracked as well as to prevent each respondent from taking the survey more than once. Subsets of the data have a larger margin of error than the whole data set.
>
> While additional factors can create error, such as question wording and question order, JZS took steps to reduce such error. Slight weights were

---

6      The government observes that Garcia is not a named defendant in that case, but is merely mentioned in the complaint. Surreply. at 9.

7      Defendant describes Zogby as "a jury consultant." Mot. at 2.

> applied to age and race to more closely reflect the population of those aged
> 60 and above.[8]

*Id.* at 2, 21.  Zogby does not otherwise describe how he developed or obtained this list of registered

voters or how particular respondents were identified and selected to take the online survey.

The second survey was commissioned by the Federal Public Defenders' Office on behalf

of January 6 defendants in general:

> [T]he Federal Public Defenders' Office for the District of Columbia
> commissioned Select Litigation, LLC, of Washington, D.C., to assess the
> federal jury pool in the District of Columbia on behalf of the many indigent
> clients indicted for activities arising out of the January 6, 2021,
> demonstrations at the U.S. Capitol building who are represented by either
> Assistant Federal Public Defenders or other counsel appointed pursuant to
> the Criminal Justice Act.  To that end, Select Litigation conducted two
> public opinion polls, one among jury-eligible citizens of the District of
> Columbia, and one among jury-eligible citizens of the Atlanta Division of
> the Northern District in Georgia.
>
> * * *
>
> The samples for the polls were drawn from current lists including both
> landlines and cellular devices, and the sampling was done in a manner to
> ensure that every jury-eligible citizen on the lists from each of the two
> jurisdictions would have an equal probability of being included in the final
> sample.  Interviewing for the polls was conducted by professional
> interviewers by telephone January 9-14, 2022. Respondents were
> interviewed on both landlines and mobile devices. The total sample size was
> 800 respondents comprised of 400 interviews in each jurisdiction.
>
> * * *
>
> All polls are subject to errors related to interviewing a sample of a universe
> rather than the entire population. The margin of estimation or sample error
> for a sample size of 400 is 4.9 percentage points at the 95% confidence
> interval. This means that in 95 out of 100 cases, the responses in these polls
> should be within plus or minus 4.9 percentage points of the responses that
> would have been obtained interviewing the entire population in each
> jurisdiction.

---

8       The survey does not explain why such weights would be appropriate, but simply asserts
that they were applied.  *See* Zogby Survey at 2.

Hickman Survey at 1.

The third survey was commissioned "by Law Offices of Juli Haller . . . and by Fischer & Putzi, P.A.," who represent other January 6 defendants.  In Lux Survey at 1.  The survey states that In Lux

> was asked to design and conduct a study that would meet the following objectives:
>
> 1. Identify any specific themes of bias.
>
> 2. Gauge the intensity of any prejudicial bias detected.
>
> 3. Determine whether the rates and intensity of any prejudicial bias discovered within the DC community are unique to the DC Community.
>
> 4. Ascertain whether respondents who indicate harboring bias against Defendants report doubt in their ability to be fair and impartial jurors for Defendants.
>
> To achieve these objectives, ILR impartially conducted a well-conceived community attitude survey ("CAS") of the DC Community and, concurrently, of the qualified jury pools in three additional federal districts ("Test Areas.").  Over 1500 potential jurors were interviewed, yielding over 350 responses from each Test Area.  Respondents were randomly selected from master lists of potential jurors in each Test Area created in the same manner master jury wheels for the federal districts are created.
>
> * * *
>
> So that sampling of fair cross-sections representative of realistic juries would naturally occur in the Study, every reasonable effort was taken to replicate official processes used to create master jury wheels and summon jurors when creating the master lists and randomly selecting for inclusion in the Study.  The Study's master lists were created, primarily, with a complete and then-current list of voters in each Test Area and, secondarily, with a supplemental list of consumers in each Test Area.  Any duplicate records coming in with the second list were removed prior to the merging of the lists into the master list.  Respondent households were randomly selected from the master lists of likely eligible jurors within each Test Area's boundaries. . . . Each phone number randomly selected was called

back up to seven times, or until contact was made, on various days of the week and at different times of day.

*Id.* at 1, 15 (footnotes omitted).

## Legal Framework

The Sixth Amendment guarantees criminal defendants the right to a trial "by an impartial jury of the State and district wherein the crime [was allegedly] committed," U.S. Const. amend. VI, and Article III specifies that "such Trial shall be held in the State where the said Crimes [were allegedly] committed," U.S. Const. art. III, § 2, cl. 3; *see also id.* ("[W]hen not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.").

Federal Rule of Criminal Procedure 21 authorizes the transfer of a case to another district, though, for prejudice or for convenience. A court has the discretion to transfer "for the convenience of the parties, any victim, and the witnesses, and in the interest of justice" under Rule 21(b), but Rule 21(a) requires that upon the defendant's motion, "the court *must* transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." (emphasis added). The Supreme Court reiterated this principle in *Skilling v. United States*, 561 U.S. 358, 378 (2010), and it recognized that transfer of the proceeding to a different district "if extraordinary local prejudice will prevent a fair trial" is "a basic requirement of due process."

There is no dispute about this fundamental proposition; the question is whether that level of prejudice has been shown at this early stage in the proceedings. The Supreme Court went on to explain in *Skilling* that a "presumption of prejudice . . . attends only the extreme case." 561 U.S. at 381. It reviewed the cases in which it had concluded that transfer was required – *Rideau v. State*

*of La.*, 373 U.S. 723 (1963), *Estes v. State of Tex.*, 381 U.S. 532 (1965), and *Sheppard v. Maxwell,* 384 U.S. 333 (1966) – and noted that in each, it had "overturned a conviction obtained in a trial atmosphere that [was] utterly corrupted by press coverage."  561 U.S. at 380 (internal quotation marks omitted).  It took pains to caution that those "decisions 'cannot be made to stand for the proposition that juror exposure to . . . news accounts of the crime . . . alone presumptively deprives the defendant of due process.'"  *Id.*, quoting *Murphy v. Florida,* 421 U.S. 794, 798–99 (1975).

> Prominence does not necessarily produce prejudice, and juror *impartiality*, we have reiterated, does not require *ignorance*.

*Skilling,* 561 U.S. at 381 (emphasis in original).

Furthermore, the D.C. Circuit has cautioned that it is preferable to conduct voir dire in the first instance to determine whether it will be possible for a fair and impartial jury to be selected. *See United States v. Haldeman*, 559 F.2d 31, 41, 62–63 (D.C. Cir. 1976) (en banc) (per curiam) (counseling against a "pre-voir dire conclusion" that "a fair jury cannot be selected").  That is because "pretrial publicity, even if pervasive and concentrated, cannot be regarded as leading automatically and in every kind of criminal case to an unfair trial."  *Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 565 (1976).  Instead, a "thorough examination of jurors on voir dire" is the most important tool for ensuring that a defendant receives a fair and unbiased jury.  *Id.* at 554; *see also Haldeman,* 559 F. 2d at 63 ("if an impartial jury actually cannot be selected, that fact should become evident at the voir dire.").

### Analysis

### I.     Voir dire will be the appropriate means to assess potential juror prejudice in this case.

The January 6 cases will not be the first politically or emotionally charged trial in the District of Columbia.  Juries were successfully seated here when individuals were charged with

crimes related to the Watergate scandal, *see, e.g.*, *Haldeman*, 559 F.2d at 63, and the government

has pointed to a number of other highly publicized cases that were tried where they were brought:

> [C]ourts have declined to transfer venue in some of the most high-profile prosecutions in recent American history.  *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam) (capital prosecution of Boston Marathon bomber); *Skilling*, 561 U.S. at 399 (fraud trial of CEO of Enron Corporation); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (trial of participant in 1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (terrorism prosecution for conspirator in September 11, 2001 attacks).

Opp. at 8.

In those instances, the safeguard against a biased jury has always been the same:  an

"extensive voir dire" with a "detailed inquiry into the sources and intensity of the [] exposure to

[pretrial] publicity."  *Haldeman*, 559 F.2d at 69; *see also id.* at 64 n.43 ("the trial court did not err

in relying less heavily on a poll taken in private by private pollsters and paid for by one side than

on a recorded, comprehensive voir dire examination conducted by the judge in the presence of all

parties and their counsel pursuant to procedures, practices and principles developed by the

common law since the reign of Henry II"); *Tsarnaev*, 780 F.3d at 17 ("[C]oncerns about jurors

who have fixed opinions or emotional connections to events, or who are vulnerable to improper

influence from media coverage, are legitimate concerns.  The court and the parties are diligently

addressing them through the voir dire process.") (brackets omitted).

Defendant points to one district court case in which a transfer was deemed necessary due

to the extraordinary prejudice within the community:  the tragic Oklahoma City bombing.  *See*

*United States v. McVeigh*, 918 F. Supp. 1467, 1470 (W.D. Okla. 1996) ("The effects of the

explosion on that community are so profound and pervasive that no detailed discussion of the

evidence is necessary.").  But he is unable to point to instances in which that precedent was

10

followed in this district or in any other federal court,[9] and that is because the decision arose in a

unique context that bears no resemblance to the situation here.   The trial of Timothy McVeigh and

Terry Nichols involved two individuals charged with blowing up the federal office building in

Oklahoma City, resulting in the deaths of 168 people – including infants and children who were in

a day care center on site – and injuries to hundreds of others.   While the rest of the nation was

shocked and deeply saddened by news of the event, the personal impact was concentrated almost

entirely in Oklahoma City, where the friends and family members of the victims resided, and for

that reason, the court granted the motion for a change of venue from the Western District of

Oklahoma without feeling the need to expound on the obvious reasons underlying the decision.

*Id.*   Here the situation is reversed:   hundreds of individuals have been charged in a single incident

---

9       Defendant cites *United States v. Awadallah*, 457 F. Supp. 2d 246 (S.D.N.Y. 2006), Reply
at 6, but the judge in that case declined to follow *McVeigh* and denied the motion for a change in
venue.   457 F. Supp. 2d at 252–4.   Defendant also reminds the Court of "the D.C. Sniper John
Muhammad."   Reply at 7, citing *2nd Sniper Trial Venue Changed*, CBS News (July 24, 2003),
https://www.cbsnews.com/news/2nd-sniper-trial-venue-changed/.   The case involved a series of
shocking and random shootings in the region that caused great fear among local residents until the
perpetrators were caught, and a Virginia state court judge exercised his discretion to move the case
to an unaffected county.   The situation underlying that decision cannot be likened to the case at
hand.   Finally, defendant raised *United States v. Casellas-Toro*, 807 F.3d 380 (1st Cir. 2015)
during the motion hearing.   But the transfer in that case happened *after* voir dire and it was deemed
necessary because of what voir dire revealed.   *See id.* at 383–84, 389 (defendant was charged in
federal court with making false statements, and voir dire occurred two months after he was
sentenced to 109 years' imprisonment for murdering his wife in a separate trial in a Puerto Rican
Commonwealth court; "rather than reducing concerns of bias, voir dire revealed the depth of
community knowledge of, and hostility to, Casellas," as 96.6% of prospective jurors not only knew
about the defendant, but "knew about Casellas's murder of his wife").   Given the procedural
posture of the case and the extremely prejudicial, but highly concentrated publicity
involved, *Casellas-Toro* has no bearing on defendant's situation at all.

with primarily nationwide implications, and there are a much smaller number of injured victims

with ties to the community, none of whom the defendant is charged with assaulting.[10]

The rest of the *McVeigh* opinion dealt with the selection of an appropriate alternative

venue, and whether the defendants could receive a fair trial in *any* district in the state of Oklahoma,

which had been heavily saturated with publicity.

> The emotional burden of the explosion and its consequences has been
> intensified by the repeated and heavy emphasis on the innocence of the
> victims and the impact of their loss on their families.  The tragic sense is
> heightened by the deaths of infants and very young children in the day care
> center.
>
> * * *
>
> The intensity of the humanization of the victims in the public mind is in
> sharp contrast with the prevalent portrayals of the defendants.  They have
> been demonized. . . . All of the Oklahoma television markets have been
> saturated with stories suggesting the defendants are associated with "right
> wing militia groups."
>
> * * *
>
> The possible prejudicial impact of this type of publicity is not something
> measurable by any objective standards.

918 F.Supp. at 1472–73.  As the court in *McVeigh* explained, "[a]s time passed, differences

developed in both the volume and focus of the media coverage in Oklahoma compared with local

coverage outside of Oklahoma and with national news coverage." *Id.* at 1471.

> Television stations conducted their own investigations, interviewing
> "eyewitnesses" and showing reconstructions and simulations of alleged
> events.  Such "investigative journalism" continued for more than four
> months after the explosion. Perhaps most significant was the continuing
> coverage of the victims and their families.  The Oklahoma coverage was
> more personal, providing individual stories of grief and recovery.  As late

---

10      Of course, voir dire would include asking members of the jury panel if any of them has a
close connection to a person who sustained injuries during or arising out of the events at the Capitol
on January 6.

> as December 1995, television stations in Oklahoma City and Tulsa were
> broadcasting special series of individual interviews with family members
> and people involved in covering the explosion and its aftermath.

*Id.*

These is no comparable set of especially local concerns in this case. The defendant has not

pointed to *any* articles or stories in local media that name him as an individual,[11] and voir dire will

explore whether any juror has read or seen anything about the defendant[12] as well as the impact of

January 6 media coverage in general.

Defendant also relies heavily on *Skilling*. But it is notable in that case, the Supreme Court

*rejected* the notion that a change of venue should have been granted in the criminal prosecution of

the former Chief Executive Officer of Enron, even though the local publicity had been relentless.

561 U.S. at 381–85. Moreover, the impact of the alleged fraud was felt particularly keenly in

Houston, where Enron was located, and many residents had lost their jobs or hard-earned pensions

heavily invested in Enron stock. Skilling argued that the trial court erred in refusing to move the

trial to a different venue based on a presumption of prejudice given "the community passion

aroused by Enron's collapse and the vitriolic media treatment aimed at him." 561 U.S. at 377

(internal quotation marks omitted). But the Court found that the "sheer number of victims" was

---

11      In fact, the government is the only party to do so, as it acknowledges that "Garcia's name appears in . . . one Washington Post article over the last 13 months." Opp. at 11 n.3, citing Jonathan Edwards, *An Alleged Capitol Rioter Says His Ankle Monitor Beeps Too Loudly. He Wants a Judge to Let Him Remove It.*, Washington Post (Sep. 10, 2021), https://www.washingtonpost.com/nation/2021/09/10/capitol-rioter-ankle-monitor-beeping/.

12      Though the media attention Garcia has received pales in comparison to coverage of Jeffrey Skilling, Timothy McVeigh, or Tsarnaev, it is true that his repeated pretrial motions regarding his GPS ankle monitor received some press attention. *See, e.g.*, Antonio Planas, *Capitol Riot Suspect Wants GPS Monitor Removed, Citing Loud Beeping in Front of Clients*, NBC News (Sept. 10, 2021), https://www.nbcnews.com/news/us-news/capitol-riot-suspect-wants-gps-monitor-removed-citing-loud-beeping-n1278957.

not enough to trigger a presumption of prejudice; "[a]lthough the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron, the extensive screening questionnaire and follow up *voir dire* were well suited to that task." *Id.* at 384.

If it was appropriate to proceed to voir dire and attempt to seat a jury in that case, the *Skilling* decision does not do much to mandate a change of venue in this one, where (1) both the alleged objective of the charged offenses and the effects felt were largely national; (2) the media coverage of the event as a whole – while substantial – has been largely national as well; and (3) importantly, the media coverage has related to over 700 defendants and those who may have organized or inspired them, and is not personally focused on the defendant himself as in *Skilling*.

When the *Skilling* court differentiated the case before it from those where prejudice was presumed, it highlighted three relevant factors: (1) "the size and characteristics of the community in which the crime occurred"; (2) whether pretrial publicity "contained [a] confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight"; and (3) the amount of time that had elapsed since the alleged crime and whether the passage of time had led to "diminished" media attention. 561 U.S. at 382–84.[13]

---

13    A fourth factor relevant to the post-conviction review in *Skilling* that does not bear on this motion was whether the jury's verdict reflected an absence of prejudice, and the Court took note of the fact that Skilling had been acquitted on some counts. 561 U.S. at 383–84.

The first factor does not support a change in venue.  Washington, D.C. has approximately 700,000 residents and about 600,000 of those residents may be in the jury pool in this case;[14] it is not a particularly large community, but it is not a small or insular one, either.  *See Skilling*, 561 U.S. at 382 (differentiating between communities with 150,000 residents and larger communities with venires of approximately 600,000 individuals), comparing *Gentile v. State Bar of Nev.,* 501 U.S. 1030, 1044 (1991) (plurality opinion) and *Rideau*, 373 U.S. at 724.  The master list of available jurors is large enough to include individuals who have paid little or no attention to the January 6 cases.[15]  It includes several hundred thousand District residents who may not be involved in policy or politics or the operation of the federal government at all; who travel to and from work or school without coming near the Capitol; and who may have never heard of the Proud Boys, much less any individual members of the group.[16]  While it is not the largest district in the country, the size of the Washington, D.C. jury pool weighs against transfer in this instance.

---

14      The Jury Office reported that the Master Jury Wheel was comprised of 599,237 citizens as of January 19, 2022.  Jury Office for the U.S. District Court for the District of Columbia, Master Jury Wheel (2022) (accessed July 7, 2022) (on file with Jury Office).  The 2020 United States census estimated the District's population at 689,545.  *See The District of Columbia Gained More Than 87,000 People in 10 Years*, United States Census Bureau (Aug. 25, 2021), https://www.census.gov/library/stories/state-by-state/district-of-columbia-population-change-between-census-decade.html.

15      This conclusion is buttressed by the surveys; about 33% of respondents in the Zogby pool stated that they were "somewhat familiar" or "not familiar/not sure" with the events of January 6.  Zogby Survey at 19.  The Hickman Survey indicates that only 33% of D.C. residents surveyed had seen or read "a lot" about the January 6 cases, while 25% had seen or heard "some," and 13% had seen or heard "not much" or "none at all."  Hickman Survey at 14.

16      While defendant adamantly maintains that his status as a Proud Boy gives rise to prejudice because of "the exceptional nature of extreme prejudice against Miami-based Proud Boys charged in the J6 Riot," Reply at 4 (describing "The Proud Boys and D.C's ongoing vitriolic feud"), it is not at all clear that a majority of the city's residents are particularly familiar with the group.  Defendant's own survey asked, "Are you familiar with the organization called the Proud Boys?" and 115 of the 380 respondents, or 30%, were not familiar with them at all.  Zogby Survey

The second factor also does not necessitate a change in venue.  There has been no confession or graphic video, specific to this defendant, publicized in the local media.

The third factor, the amount of time that has passed – and whether media attention has passed, along with it – is more complicated, but ultimately does not weigh in favor of changing venue either.

At the time this motion was filed and prior to June 9, 2022, it would have been fair to say that while media coverage about January 6 had continued, it no longer dominated the news and had become less intense than it was in the immediate aftermath of the riot.  *See Tsarnaev*, 780 F.3d at 22 ("The nearly two years that have passed since the Marathon bombings has allowed the decibel level of publicity about the crimes themselves to drop and community passions to diminish.").  But

---

at 23.  And the survey does not shed light on how many of the 265 who responded "yes" are well-informed about the group's activities and how many simply had heard the name.

More important, any potential ties with the group may not come before the jury at all; the indictment does not allege that defendant is associated with the group, and unlike the defendants in *United States v. Nordean et al.*, No. 21-cr-175, he is not charged with conspiring with other members.  At this point, it is the defendant, and not the prosecutor, who keeps bringing it up.  *See* Zogby Survey at 26 ("Are you familiar with the Proud Boys organization member named Gabriel Garcia); *see generally* Mot. (mentioning the Proud Boys eleven times and emphasizing his "association with them"); Reply (mentioning the Proud Boys sixteen times and saying "Garcia is part of this discrete group").  The government indicated at the motions hearing that it would not "lean on" evidence of the defendant's affiliation with the group, and that it might not be introduced at all, Draft Tr. of Mot. Hr'g at 21, *United States v. Garcia*, No. 21-cr-129 (D.D.C. argued April 26, 2022), but in the event it concludes that the information bears on the case, or that it needs to introduce or explain defendant's shouting "Free Enrique" while inside the Capitol, the way to address evidence that might be unduly prejudicial is through a motion *in limine*, not to move the trial.  Even if the evidence is ultimately deemed relevant and admissible, the defendant could seek a limiting instruction as to the purpose for which it could be considered.  Finally, the Court notes that the mere association with an unpopular group is not at all similar to the sort of press coverage that has required a transfer, such as the local broadcast of a confession to the actual crime charged.  *See Rideau*, 373 U.S. at 724 (interview "of interrogation by the sheriff and admissions by Rideau that he had perpetrated the bank robbery, kidnapping, and murder" broadcast to approximately 100,000 people over three days in a parish with a population of about 150,000).

while the publicity abated substantially in the year after the attack on the Capitol, it has recently regained prominence with the widespread coverage of the Congressional hearings conducted by the Select Committee to Investigate the January 6th Attack on the United States Capitol. Therefore, the publicity remains a factor that must be taken into consideration in jury selection.

However, the Congressional hearings and the media coverage of them relate mostly to the events of January 6 in general and the role that public officials and/or their advisors and campaigns may have played in bringing them about, not the particular activities of any individual defendant.[17] After the first hearing, which did include footage of the attack on the Capitol and the outnumbered law enforcement officers trying to protect it,[18] the focus has switched to legal and political machinations behind the scenes to substitute electors or overturn the results of the elections in other ways, and there has been little mention of the rioters themselves.[19]   And though the Proud

---

[17]     *See, e.g.*, Jonah Waldez, Sarah D. Wire & Jon Healey, *What's the TV Schedule for the Jan. 6 Committee Hearings?*, LA Times (July 5, 2022), https://www.latimes.com/politics/story/2022-06-13/what-is-the-tv-schedule-for-the-next-jan-6-committee-hearings (summarizing "what happened" at each hearing, such as the June 16 hearing "on the pressure that Trump and . . . lawyer John Eastman exerted on Vice President Mike Pence to reject electoral votes from seven states Biden won," and the June 21 hearing "about the efforts by Trump and his lawyers to get them to reverse election results").

[18]     *See, e.g.*, Domenico Mantanaro, *New Revelations and 3 Other Takeaways from the First Jan. 6 Committee Hearing*, NPR (June 10, 2022), https://www.npr.org/2022/06/10/1104103404/new-revelations-and-other-takeaways-from-first-jan-6-committee-hearing (the hearing revealed "[n]ot previously publicly seen video footage from police body cameras, Capitol hallway and office footage, as well as police radio communication").

[19]     *See, e.g.*, *January 6th Committee News*, NYTimes, https://www.nytimes.com/news-event/jan-6-committee ("In a series of public hearings, the House committee investigating the Capitol riot on Jan. 6, 2021, is seeking to lay out the full magnitude of former President Donald J. Trump's attempts to remain in power after the 2020 election.").

Boys have been mentioned,[20] defendant Garcia has not been named or singled out in the presentations.  So while the Court recognizes that the events of January 6 are receiving substantial attention in the media at this time, and a rigorous voir dire will be needed to ferret out potential biases, this particular case has not been subject of attention, and this factor also does not weigh in favor of transferring the case.[21]

Finally, the Court's assessment that presuming prejudice would be unwarranted in this case under the *Skilling* factors has been borne out by the actual experience of other courts in this district. To date, courts have had little difficulty qualifying enough jurors to empanel juries, with the requisite number of alternates, in January 6 cases.  *See United States v. Reffitt*, No. 21-cr-32, Min.

---

20      *See, e.g.*, Orlando Mayorquin, *Who Are the Proud Boys? Extremist Group at the Center of Prime-Time Jan. 6 Committee Hearings*, USA Today (June 13, 2022), https://www.usatoday.com/story/news/politics/2022/06/13/proud-boys-jan-6-committee-hearings/7583359001/.

21      To the extent there has been publicity specific to this defendant in the time that has passed since January of 2021, it was the defendant himself who decided to hold a press conference outside of the federal courthouse in Miami on the anniversary of the attack to announce his take on the events and explain his motivation.  *See* Jamie Guirola, *'A Lot of Misrepresentation': Miami Proud Boys Member Charged in Riot Defends Entering Capitol*, NBC Miami (Jan. 6, 2022), https://www.nbcmiami.com/news/local/a-lot-of-misrepresentation-proud-boy-charged-in-riot-defends-entering-capitol/2655494/.  Thus the defendant bears some responsibility for the limited public attention he has received, and the suggestion that he is seeking the transfer to avoid the effects of publicity rings hollow since he has asked to be sent to the U.S. District Court for the Southern District of Florida, the very courthouse where he summoned the cameras, in the district where he is better known.  *See* Mot. at 11 ("Garcia stands out more in news coverage, because he ran in the primary in 2020 as Republican candidate for Florida House of Representative in District 116.").  The media coverage about the defendant is not overwhelming in Florida either, but it is more frequent than in the District of Columbia.  *See, e.g.*, Kevin Boulandier, *Here Are the 13 South Floridians Charged in the U.S. Capitol Riot*, NBC Miami (June 14, 2022), https://www.nbcmiami.com/news/local/here-are-the-13-south-floridians-charged-in-the-u-s-capitol-riot/2781945/; David Ovalle & Jay Weaver, *Former Florida GOP Candidate Arrested in Storming of U.S. Capitol*, Tampa Bay Times (Jan. 19, 2021), https://www.tampabay.com/news/florida-politics/2021/01/19/former-florida-gop-candidate-arrested-in-storming-of-us-capitol/.

Entry (Feb. 28, 2022) ("Minute Entry for Jury Selection as to GUY WESLEY REFFITT held on 2/28/2022 before Judge Dabney L. Friedrich"); *United States v. Robertson*, No. 21-cr-34, Min. Entry (April 5, 2022) ("Voir Dire commenced and concluded with twelve jurors and two alternates selected and sworn.  Jury Trial commenced."); *United States v. Thompson*, No. 21-cr-161, Min. Entry (April 11, 2022) ("Jury Selection as to (1) DUSTIN BYRON THOMPSON begun and concluded on 4/11/2022 re Counts 1s,2s,3s,4s,5s,6s.  Jury panel of 14 selected but not sworn.  Jury Trial set to commence."); *United States v. Webster*, No. 21-cr-208, Min. Entry (April 25, 2022) ("Jury Selection as to THOMAS WEBSTER held on 4/25/2022.  Panel of twelve (12) jurors and two (2) alternates selected but not sworn. Jury Trial set."); *United States v. Hale-Cusanelli*, No. 21-cr-37, Min. Entry (May 23, 2022) ("Jury Selection as to TIMOTHY LOUIS HALE-CUSANELLI began and held on 5/23/2022 on Counts 1s, 2s, 3s, 4s, 5s. Twelve (12) jurors and two (2) alternates selected, but not sworn."); *United States v. Williams*, No. 21-cr-377, Min. Entry (June 27, 2022) ("Jury Selection began and concluded, 12 jurors and 2 alternates selected and sworn.").

Since there has been no indication in any January 6 trial in this courthouse that prejudice is so widespread in the venire that the ordinary voir dire process will be insufficient to guarantee a fair jury, and since the applicable legal precedents do not support defendant's request, there is no reason to transfer this case without first trying to select a jury here.  *See also United States v. Rhodes*, No. 22-cr-15, 2022 WL 2315554, at *21 (D.D.C. June 28, 2022) (concluding that "[a]pplying the *Skilling* factors here does not give rise to a presumption of prejudice" and considering the same surveys presented in this case); *United States v. Bochene*, No. 21-cr-418, 2022 WL 123893, at *2 (D.D.C. Jan. 12, 2022) ("Defendant has failed to establish such 'extreme circumstances' here; there is no reason to believe that members of the jury venire will even know

who he is or what he allegedly did on January 6, much less that a significant number of the members of the venire will lack the capacity to evaluate the case against Defendant based solely on the facts of *his* case.") (emphasis in original); *United States v. Caldwell*, No. 21-cr-28, Omnibus Order (Sept. 14, 2021) [Dkt. # 415] at 10–11 (defendant moved to change venue, but there was no "proof that the residents of the District of Columbia have any preconceived notions about Caldwell specifically" and "the articles he cites as biasing the local populace against him are, for the most part, written by *national* media outlets," "consumed by *national* audiences and say[ing] nothing about the jury pool in the District of Columbia specifically.") (emphasis in original); *United States v. McHugh*, No. 21-cr-453, Min. Entry (May 4, 2022) ("Parties discussed trial and motion [Dkt. # 55] to change venue.  Motion heard and DENIED WITHOUT PREJUDICE.  Jury selection set for 10/18/2022 at 09:30 AM."); *United States v. Fitzimons*, No. 21-cr-158, Min. Order (Dec. 14, 2021) ("For the reasons stated on the record in the December 14, 2021 hearing, it is hereby ORDERED that Defendant's [Dkt. # 47] Motion to Change Venue is DENIED without prejudice as premature."); *United States v. Reffitt*, No. 21-cr-32, Min. Order (Oct. 15, 2021) ("For the reasons stated during the October 15, 2021 motions hearing, the defendant's [Dkt. # 37] Motion to Change Venue is denied without prejudice.").

## II.   The surveys are flawed and do not overcome the presumption that voir dire can ferret out prejudice and bias.

Defendant argues that the surveys show that the D.C. jury pool is incurably prejudiced against him.  *See* Mot. at 5–7, 10–14.  But all of the surveys are flawed, and none supply persuasive evidence that would support a decision to transfer the case without trying the voir dire process first.

### a.  The surveys are not representative of the D.C. jury pool.

The first problem with the information the defense has provided is that the surveys did not target the full range of this district's jury pool.  The list of participants in the Zogby survey was generated based on voter registration records, Zogby Survey at 2, but the D.C. Master Jury Wheel is generated based on three different sources:  the Registered Voters Master File of the D.C. Board of Elections, D.C. Department of Motor Vehicles records "of individuals 18 years and older who hold a driver's license, learner's permit, or valid identification card," and "the list of all individuals of the District of Columbia whose income tax forms are filed with the D.C. Department of Finance and Revenue."  *See Jury Selection Plan for the United States District Court for the District of Columbia for the Random Selection of Grand and Petit Jurors*, United States District Court: District              of              Columbia,              1              (2016), https://www.dcd.uscourts.gov/sites/dcd/files/JurySelectionPlan2016.pdf ("Jury Selection Plan"). This is a significant omission; the court draws from all three sources precisely because "an even greater number of citizens will be eligible for jury service if supplemental sources are also

employed." *Id.* By focusing on only one segment of the pool of potential jurors, defendant

excludes many who live or work here but may have no particular political affiliation or interest.[22]

The Hickman survey is similarly problematical. It reports that it solicited the views of

"juror-eligible" residents of the area by telephone, but it does not define that term or identify the

source of the respondents' phone numbers. Hickman Survey at 1, 5. Since the method utilized for

selecting survey participants is unexplained, there are no grounds to feel confident that it accurately

reflects the views of a cross-section of the D.C. jury pool. And this skepticism is borne out in the

data; 99% of the D.C. respondents were "officially registered to vote in Washington, D.C.,"

meaning this survey missed out on the same potential jurors the Zogby Survey did. *Id.* at 13.

Finally, the In Lux Survey asserts that it acted in the "same manner" as "master jury wheels

for the federal districts are created," In Lux Survey at 1, but it does not specify the sources it used,

other than to state that "master lists were created, primarily, with a complete and then-current list

of voters in each Test Area and, secondarily, with a supplemental list of consumers in each Test

Area." *Id.* at 15. "Consumers?" That is not how this jurisdiction's Master Jury Wheel is

---

22    This omission bears upon one of the recurring themes in defendant's pleadings. He
emphasizes that "[a]pproximately 93% of voters in Washington voted against Donald Trump,
rendering it the least diverse political population in the country." Mot. at 5. As he sees it, "[t]he
loathing towards Donald Trump and his supporters in the District is obvious." *Id.* But the D.C.
Circuit has already established that "a community's voting patterns are [not] at all pertinent to
venue." *Haldeman*, 559 F.2d at 64, n.43. Defendant's motion is founded on an assumption that
no Biden voter will be able to fairly assess whether the government had produced sufficient
evidence to prove a particular January 6 offense beyond a reasonable doubt. But that sort of bias
must be shown through voir dire; leaping to conclusions will not suffice. Moreover, citing those
percentages neglects the fact that jurors are drawn from sources in addition to voter registration
rolls, and that a substantial portion of eligible voters in the community did not vote at all. *See*
Drew DeSilver, *Turnout Soared in 2020 as Nearly Two-Thirds of Eligible U.S. Voters Cast Ballots
for President, Pew Research Center* (Jan. 28, 2021), https://www.pewresearch.org/fact-
tank/2021/01/28/turnout-soared-in-2020-as-nearly-two-thirds-of-eligible-u-s-voters-cast-ballots-
for-president/ (approximately 36.3% of estimated eligible D.C. voters did not vote for anyone in
the 2020 Presidential election).

constructed. Though the survey purports to rely on the court's website, *see id.*, citing https://www.dcd.uscourts.gov/sites/dcd/files/JurySelectionPlan.pdf, it fails to clarify how the "supplemental list of consumers" was generated or obtained, or to describe how that list might be related to the sources utilized by the Jury Office. *See id.* So the third survey is also of limited utility as a predictor of juror behavior.

      **b. The surveys include flawed questions and do not support a finding of prejudice.**

Defendant asserts that the poll data so clearly depicts a biased venire that there would be no point to undertaking voir dire. *See* Mot. at 2. But none of the three surveys paint that picture.

The Zogby survey contains poorly written questions that produced unreliable, uninformative answers. For example, question twelve of the Zogby survey asks: "Are you familiar with the Proud Boys organization member named Gabriel Garcia?" Zogby Survey at 26. Instead of simply ascertaining whether the respondents had ever heard of him at all, or whether the respondents had any knowledge or opinion about the Proud Boys, the question itself *gave* the respondents information. This would be an entirely inappropriate way to proceed in a voir dire overseen by a court; as in any trial, the charges in a January 6 case would be summarized, the defendant would be introduced, and the jurors would be asked if they knew him or had read or heard anything about his case. If it turns out that evidence of any association with the Proud Boys is to be introduced at trial, the members of the jury panel would be asked a separate, general question about whether they have ever heard of the group or if they have any opinion – positive or negative – about it. And, of course, jurors would be asked questions designed to explore whether their views about January 6 in general would make it difficult to assess the evidence against any individual defendant fairly and with an open mind, without bias or prejudice to either side.

Another question asks, "[w]hich description of the January 6, 2021 events at the US Capitol comes closer to your opinion about it," and provides only these options:  (1) "The events at the US Capitol on January 6, 2021 posed a dire threat to the fabric of our nation and were the worst assault on US democracy since 9/11, Pearl Harbor, or even the Civil War," or (2) "The events at the US Capitol on January 6, 2021 were unwise and caused senseless damage to the Capitol building and people's lives, some of whom were lost, but the events were not insurrectionist and did not pose a threat to US democracy."  Zogby Survey at 21.  This question puts words in the respondents' mouths and creates an artificial, binary choice between two highly inflammatory potential responses.  It does little to explore anyone's opinion; it merely exposes potential jurors to the sort of hyperbole defendant insists will render them incompetent to serve.

Zogby's loaded questions illustrate exactly why the D.C. Circuit is of the view that carefully crafted, non-leading questions approved by a neutral judge are more likely to uncover bias than questions formulated by a consultant paid by one party.  *See Haldeman*, 559 F.2d at 64 n.43.[23]

The Hickman Survey also includes questions that are troubling because of their structure and/or leading nature.  For example, question four asked:  "[f]rom what you have heard or read, do you think the people who were arrested for activities related to those demonstrations are guilty or not guilty of the charges brought against them?"  Hickman Survey at 15.  Question five similarly asked:  "[a]ssume you are on a jury for a defendant charged with crimes for his or her activities on

---

23      Defendant invites the Court to ignore *Haldeman*, arguing that it contains "archaic prejudice," Reply at 9, an "antiquated rationale," *id.* at 7, and "belongs in the past," *id.* at 12.  But the Court is bound to follow D.C. Circuit precedent of any age, and the condescension in the motion is not supported by persuasive analysis as to why the decision should be deemed to be flawed, or why the Court should not follow it today as it has in past.  *See also Rhodes*, 2022 WL 2315554, at *22–23 (noting that *Haldeman* is binding authority as part of its analysis).

January 6th.  Are you more likely to vote that the person is guilty or not guilty of those charges?"
*Id.*  The problem with these questions is that they gave the respondent an unduly constricted choice:
guilty or not guilty.  The Hickman Survey puts forward a conclusion that these answers reveal a
community unwilling to adhere to the presumption of innocence.  *See id.* at 2 ("Their bias against
the defendants is evident in numerous results and is reflected in a significant prejudgment of the
case:  a clear majority admit they would be inclined to vote 'guilty' if they were serving on a jury
at the defendants' trial."), 3 ("An overwhelming majority of the District of Columbia jury pool
have a prejudgment about the case.").  But the respondents were informed that this was a public
opinion poll, and the questions specifically asked for a prediction based on what respondents had
"heard or read," or to guess about a theoretical case.  *Id.* at 14–15.  So the survey sheds little light
on what members of the jury who have been screened for biases during voir dire and asked if they
can put aside what they have read or heard, and who are specifically instructed that they may base
their verdicts only on the evidence, will do when called upon to render a verdict with respect to an
individual defendant.

Moreover, it is telling that even when offered a yes or no choice, 46% of D.C. respondents
to question five answered that it "depends" or "don't know/refused."  Hickman Survey at 14.  This
suggests, contrary to defendant's contentions, that a considerable portion of the venire would act
in a manner that is consistent with the presumption of innocence and wait to hear the evidence.  If
almost half of the survey participants came up with those responses on their own initiative, that
suggests that an even greater percentage would have done so if given the choice.  And if one adds
the 2% of the respondents who answered that they would find the defendant not guilty to the ones
without a fixed opinion, the survey shows that there is a sizeable segment of the population – 48%
at the least – who have not already decided to convict.  *See id.*

25

Finally, the In Lux Survey suffers from similar defects, as many of its questions ask about how respondents *feel* about current events, or to speculate, rather than how they would behave during the formality of a jury trial. For example, Question 3 asked respondents: "[a]re you more likely to find a defendant charged with crimes for activities on January 6th guilty or not guilty?" In Lux Survey at 21. This overly broad question could be interpreted to apply to a wide range of offenses, so it is unclear what the respondents had in mind. Also the question called for the "likely" result in an abstract case with an unidentified defendant, and it does not do much to show that jurors would ultimately find any particular defendant guilty, or refuse to view the evidence objectively even if instructed to do so by the presiding judge. Indeed, demonstrating the limitations of this question, the number of jurors who answered that it was "too early to respond" was about the same in every single jurisdiction: 21% of D.C. respondents, 19% of Middle District of Florida respondents, 18% of Eastern District of North Carolina respondents, and 25% of the Eastern District of Virginia respondents. *Id.* at 26. And while the percentage of D.C. respondents who described themselves during the call as more likely to find a defendant guilty than not guilty exceeded the percentage in the other jurisdictions, it was as high as 48% in both North Carolina and the Eastern District of Virginia. *Id.* So there would be work to do in any court where the case was tried, and the proportion of D.C. jurors who found it too early to anticipate their likely verdict was on par with the proportion elsewhere.

This is reinforced by the few survey questions that directly asked how respondents would behave as a jurors; D.C. jurors predicted that they could be "a fair and unbiased juror for a January 6th defendant" at the highest rate of any district, and they expressed the most confidence that their "neighbors would be fair and unbiased" in such a case. In Lux Survey at 26; *see also Rhodes*, 2022 WL 2315554, at *21 (considering the same survey and noting that "District survey

26

respondents reported a higher rate of expressing their ability to be 'fair and impartial' compared to the other jurisdictions.").

In sum, the inartful questions in all of the submitted surveys, and the analysts' proclivity for overgeneralizing based on the results, demonstrate why courts have found surveys to be a poor substitute for properly conducted voir dire.  Voir dire questions – crafted by the parties and the Court – will be specific to the circumstances at issue in the trial, they will be phrased in a neutral fashion, and the process will allow for follow-up, clarification, and the observation of the respondent's demeanor.

### c. Mr. Garcia's proposed alternatives do not alleviate the concern of pretrial publicity as media coverage of January 6 was largely national.

The events of January 6 were unprecedented and serious, and there is no dispute that many public officials and well-known media figures have described them in stark terms.  Defendant

quotes some of those statements and argues that D.C. jurors "have been barraged with propaganda" about January 6.[24]  Mot. at 6.

> Indeed, for the past year, political leaders keep describing January 6 as one of the greatest tragedies in American history, and in the same league as the 9/11 terrorist attacks, the Oklahoma City Bombing, Pearl Harbor, and the Civil War.  President Biden called J6, "one of the worst attacks on our democracy," in his speech before a joint session of Congress.

*Id.* at 3.

But the jurors defendant asks the Court to draw from Maryland, Virginia, or Florida – like millions of citizens across the entire country – have all been potentially exposed to the same set of broadly disseminated video recordings, statements of witnesses and participants, and observations of pundits and political leaders; that experience is not unique to Washingtonians.  Thus, the motion fails to establish that D.C. jurors have been so drenched in publicity aimed at them in particular that they are presumptively incapable of being fair when compared to jurors drawn from any other district in the country.  As the First Circuit recognized in the prosecution of the Boston Marathon

---

24      Of course, defendant fails to mention the thousands of statements made by other political leaders and popular media figures minimizing the events of that day that have also been widely publicized.  *See, e.g.*, Jonathan Weisman & Reid J. Epstein, *G.O.P. Declares Jan. 6 Attack 'Legitimate Political Discourse'*, NY Times (Feb. 4, 2022), https://www.nytimes.com/2022/02/04/us/politics/republicans-jan-6-cheney-censure.html (reporting on the Republican National Committee's decision to censure two Republicans for participating in a "Democrat-led persecution of ordinary citizens who engaged in legitimate political discourse"); Cristina Marcos & Rebecca Kheel, *GOP downplays Jan. 6 violence: Like a 'normal tourist visit'*, The Hill (May 12, 2021), https://thehill.com/homenews/house/553227-gop-downplays-jan-6-violence-like-a-normal-tourist-visit/ (quoting Representative Andrew Clyde as stating:  "Watching the TV footage of those who entered the Capitol and walked through Statuary Hall showed people in an orderly fashion staying between the stanchions and ropes taking videos and pictures."  "You know, if you didn't know the TV footage was a video from Jan. 6, you'd think it was a normal tourist visit."); Tucker Carlson, *Tucker Carlson: The truth of what happened on Jan. 6 is still unknown*, Fox News (June 9, 2022), https://www.foxnews.com/opinion/tucker-truth-happened-jan-6-unknown ("Tucker Carlson calls out lies about the Capitol riots on January 6 . . . we did not think it was an insurrection because it was not an insurrection.  It was not even close to an insurrection.").

bomber, "[i]t is true that there has been ongoing media coverage of the advent of the trial and petitioner's pre-trial motions, both locally and nationally.  But that would be true wherever trial is held." *Tsarnaev*, 780 F.3d at 22; *see also Awadallah*, 457 F. Supp. 2d at 253 ("the effects of the September 11 attacks were felt nationwide, and there is no reason to believe that jurors in a different jurisdiction would lack an emotional response with prejudicial effects").

This issue is reflected in the very news articles defendant points to as prejudicial. Defendant's motion does not point to a single article from a local source about *him*, and most of the articles he cites about January 6 in general are from national sources as well.  For example, he highlights:  (1) an article from Salon reporting comments made by President Biden about January 6; (2) a press release from the White House disseminating additional comments by President Biden's comments about January 6; (3) an article from U.S. News providing a transcript of a speech made by President Biden about January 6; (4) an article from CNN reporting comments made by Vice President Harris about the significance of the date January 6, 2021; (5) Attorney General Garland's comments about January 6 during his confirmation hearing, as memorialized on the Senate Judiciary Committee's website; (6) an article from Yahoo reporting comments made by Attorney General Garland about January 6; (7) an article from the Pew Research Center recounting the language Democratic politicians employed in the aftermath of January 6; (8) an article from NPR reporting on warnings made by the Department of Homeland Security; (9) an article from MSNBC reporting comments made by Nancy Pelosi about January 6; and (10) a video depicting comments made by Representative Cori Bush (D-MO) on the floor of the House of Representatives.  Mot. at 3, 8–10.  Defendant appears to assume that simply because a person lives in Washington, they are aware of, and swayed by, the statements of political leaders.

There is certainly little reason to believe this would be the case with respect to members of Congress from other districts, and the notion that D.C. residents would be particularly influenced by the statements of national political figures is based on an uninformed stereotype about the people who live here.  The city includes, of course, local and federal government employees – the overwhelming majority of which are not political appointees – but also teachers, health care workers, shopkeepers, cab drivers, waiters, college students, and thousands of others whose day-to-day activities have nothing to do with politics.  There is no reason to assume that they are more prone to be influenced by politicians' pronouncements, let alone that any influence would render them incapable of being fair to this individual defendant.

Defendant's assumption that residents of the District of Columbia are peculiarly well-informed about January 6 when compared to others is further undermined by his own surveys.  For example, the Hickman Survey reported that 93% of District residents were aware "that several hundred people were arrested on charges related to" January 6.  Hickman Survey at 15.  But 87% of Atlanta residents were also aware of the January 6 charges.  *Id.*  33% of District residents had "seen, heard, or read" "a lot" "about the demonstrations at the Capitol, the investigations, arrests, and court proceeding of individuals involved in those demonstrations."  *Id.*  But 30% of Atlanta residents had also seen, heard, or read a lot about the investigations and court proceedings.  *Id.*  The Hickman Survey asked "[h]as most of the media coverage you have seen, heard, or read suggested the defendants are likely guilty or are likely not guilty of the charges brought against them?"[25]  *Id.*  Yes, 63% of District respondents said "likely guilty," but 61% of Atlanta respondents said the same, and importantly, 33% of District residents said "depends" or "don't know/refused,"

---

25    This question is flawed, but because it is flawed with respect to both groups of respondents, it still provides a useful point of comparison.

while 30% of Atlanta residents gave that response. *Id.* There are some deviations between the groups in survey responses, but by and large, Atlanta and D.C. residents appear to be quite comparable in their knowledge of the January 6 prosecutions. And the Court has not been supplied with grounds to believe that jurors in any other jurisdiction would be any different. *See* In Lux Survey at 21, 24 (respondents were asked "[a]re you aware of the demonstrations that took place at the U.S. Capitol Building on January 6, 2021," and respondents across the four comparison districts answered "yes" at rates of 93%, 94%, 92%, and 94%); *see also* Zogby Survey at 20 (nearly 55% of District residents report "national media sources," rather than "local media sources," as the "more instrumental" source "in shaping [their] opinion about [January 6]," sources that are equally available in essentially every judicial district).

Defendant does also point to more practical disruptions, such as a curfew and street closures. *See* Mot. at 6 ("The daily lives of members of the potential jury pool were disrupted in the days, weeks, and months following J6, since travel and transportation were limited and disrupted in that section of Washington."). But that curfew did not last "weeks," Mot. at 8; it was in place for one single night. *See* Nick Boykin, Matt Pusatory & Jonathan Franklin, *DC Lifts Curfew After Riots at the Capitol, Public Emergency Extended for 15 Days*, WUSA9 (Jan. 7, 2021), https://www.wusa9.com/article/news/local/dc/washington-dc-curfew-amid-unrest-at-capitol-building/65-becf9868-3413-4cf8-a930-cbb8f2813f2b. And defendant's assumption that road closures around the Capitol profoundly affected the bulk of area residents is another unsupported generalization; he seems to have forgotten that the attack on the Capitol took place during the pandemic, when most government and downtown offices were closed, and all but essential employees were working remotely. Also, the disruption in travel was short-lived and

centered around the Capitol building itself.[26]  The motion betrays defendant's ignorance of the city's geography and demographics and the presence of substantial numbers of residents who do not live or work or go to school on Capitol Hill and seldom even need to drive by.  Moreover, this Court has been provided with no basis to assume that District residents – who put up with parades, protests, and motorcades on a regular basis – would be so annoyed by one narrow set of street closures that they would be unable to serve as fair-minded jurors more than a year and a half after the restrictions were lifted.

In sum, of course there will be jurors in D.C. who are familiar with the events of January 6 and some of the more high-profile prosecutions that have followed.  But "[p]rominence does not necessarily produce prejudice," *Skilling*, 561 U.S. at 381, and these cases would be prominent no matter where they were transferred.  The real concern here is about potential bias surrounding the unique circumstances of January 6, not the unique characteristics of the D.C. jury pool, and that concern must and will be addressed through voir dire, rather than by transferring the case to a district with a venire that would present the same issues.

### Conclusion

For all of these reasons, defendant's motion to transfer venue is **DENIED**.

A separate order will issue.

*Amy B Jackson*

AMY BERMAN JACKSON
United States District Judge

DATE:  July 22, 2022

---

26      The In Lux Survey found that about 49% of D.C. respondents, a plurality of those surveyed, reported that their movements were not restricted, and an additional 4% were not sure or did not remember.  In Lux Survey at 22, 25.