**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-CR-129 (ABJ)** |
| **v.** | : | |
| | : | |
| **GABRIEL AUGUSTIN GARCIA,** | : | |
| **also known as "Gabriel Agustin Garcia,"** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Gabriel Garcia to 48 months of incarceration, three years of supervised release, $2,000 restitution, a fine, and the mandatory assessment of $100 for his felony conviction.

A sentence of 48 months of incarceration reflects a significant upward departure or variance from the top of the guidelines as calculated by the government. For the reasons set forth herein, including Garcia's targeting of the peaceful transfer of power and the defendant's use of force and threats of violence to carry out that objective, such an upward departure or variance is fully justified.

I.    **INTRODUCTION**

Defendant Gabriel Garcia participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in

losses.[1] Defendant's acts were intentional and preconceived. Defendant "breached the Capitol building[] and joined mobs and confronted officers inside the Capitol in order to disrupt Congress's certification of the Electoral College vote." Statement of Offense (SOO) ¶ 78. "When he confronted police on multiple occasions, he knew he was interfering with the police who were trying to get the rioters to leave the building." *Id.*

Defendant Garcia has attempted to characterize his actions as vigorous First Amendment activities in support of his country, and Defendant Garcia may argue that his violent conduct is excusable as a mere aberration caused by confusing and extraordinary events of the day. Any such story is a fiction. The facts show that Defendant Garcia came to Washington, D.C. in January 2021 prepared for violence and confrontation. And the facts show that Defendant Garcia was and remains proud of his ability to use physical force and intimidation to achieve a desired political outcome. These are the facts underlying Defendant Garcia's conviction, and the Court should fashion a sentence for Defendant Garcia that fully addresses and deters future violations of this kind.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the Joint Statement of Elements and Facts for Stipulated Trial filed in this case, for a short summary of the January 6, 2021 attack on the United States

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. SOO at ¶¶ 1-14.

**B.      Garcia's Role in the January 6, 2021 Attack on the Capitol**

*Garcia's Membership in the Proud Boys*

Gabriel Garcia is a 43-year-old resident of Florida. SOO ¶ 15. Since at least 2019, Garcia has been a member of the Proud Boys organization. *Id.* The Proud Boys describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists." *Id.* at ¶ 16. Proud Boys members routinely attend rallies, protests, and other events, some of which have resulted in violence involving members of the group. *Id.* There is an initiation process for new members of the Proud Boys, and members often wear black and yellow polo shirts or other apparel adorned with Proud Boys logos and slogans to public events. *Id.*

Through at least January 6, 2021, Enrique Tarrio was the national chairman of the Proud Boys organization. *Id.* at ¶ 17. Throughout the United States, there are local Proud Boys chapters, which are typically led by chapter "presidents." *Id.* Each chapter has a degree of autonomy insofar as the president of a local chapter governs that chapter in its geographic location. *Id.* As of January 6, 2021, Garcia was a member of the "Vice City" chapter of the Proud Boys, which chapter was based in Miami, Florida. *Id.* at ¶ 18. The president of the Vice City chapter was Enrique Tarrio, and Garcia was both a member of Tarrio's chapter and a personal acquaintance of his. Garcia referred to himself as Tarrio's "second hand guy[.]" *Id.*

*Gabriel Garcia's Attendance at Election-Related Rallies in Washington, D.C.*
*in November and December 2020*

Garcia traveled to Washington, D.C. in November and December 2020 in connection with rallies related to the 2020 Presidential Election. *Id.* at ¶ 19. On November 13, 2020, Garcia traveled

to Washington, D.C. with Enrique Tarrio and other members from the Vice City chapter of the Proud Boys, including Garcia's friend, Gilbert Fonticoba. *Id.* at ¶ 20. The group traveled on a private jet. *Id.* at ¶ 21. While in route to Washington, D.C., Tarrio made a public post on social media that a "can of whoopass" was on its way to Washington, D.C. While returning home on the private jet, Garcia took a video of himself. *Id.* at ¶ 21. In the video, Garcia stated, "hey, we're heading back to Miami. It was great taking care of business. *Id.* Wipe the floor with Antifa." Shortly after returning, on November 15, 2020, Garcia engaged in a private message with another user on Facebook. Garcia told the other user, "I knocked out 4 motherfuckers yesterday and it felt great." Exhibit A.

Garcia's comments about violence were not mere bluster. Videos and images taken on the night of November 14, 2020, showed Garcia and other Proud Boys engaged in multiple physical confrontations with other individuals on the streets of Washington, D.C. The sequence of images below shows Garcia repeatedly punching and kicking individuals during a large street fight in downtown Washington, D.C. *See* Exhibits B & F.





Garcia also traveled to Washington, D.C. for a second election-related rally on December 12, 2020. *Id.* at ¶ 22. During the rally on December 12, 2020, several Proud Boys were involved in an altercation in which Proud Boys members were injured, including a knife wound suffered by Proud Boys member, Jeremy Bertino. *Id.* at 23. Certain members of the Proud Boys, including Garcia, expressed anger at law enforcement in Washington, D.C. *Id.* For example, on December 14, 2020, Garcia sent a text message to five other Vice City Proud Boys, including Enrique Tarrio, that stated, "By the way CopTifas are a bunch of taxpayer waste of taxes that get paid to be ANTIFA'S personal bodyguards[.]" *Id.* The term "CopTifas" is an amalgamation of "Cops" and

"Antifa" that was used by Proud Boys to suggest that law enforcement was on the side of Antifa, whom they saw as enemies. *Id.*

Also while in Washington, D.C. on December 12, 2020, Tarrio and other Proud Boys participated in the theft and destruction of a banner that read, "#BLACKLIVESMATTER," which banner was property of Asbury United Methodist Church in Washington, D.C. *Id.* at ¶ 24. On December 17, 2020, Tarrio posted a message on Parler in which he taunted law enforcement: "Come get me if you feel like what I did was wrong. We'll let the public decide." *Id.* On December 15, 2020, Garcia sent a text message to five other Vice City Proud Boys, including Tarrio and Fonticoba, that stated in part, "God forbid you burn a Office Depot banner with BLM on it and get charged with a hate crime. GTFO[.]" *Id.*

### *Gabriel Garcia's Statements About the Stolen Election and Understanding of the Official Proceeding at the United States Capitol on January 6, 2021*

In the period between the November 3, 2020 U.S. Presidential Election and January 6, 2021, Garcia made a number of public posts on social media and sent messages in private communications reflecting his belief that the result of the Presidential Election was a "fraud," his knowledge about the Certification process, and his intent to stop that process. *Id.* at ¶ 25.

On November 7, 2020, Garcia participated in a Telegram[2] message group with members of the Vice City Proud Boys and other participants. *Id.* at ¶ 26. Participants in the chat commented that the media had just declared that Joseph Biden had won the Presidential Election. *Id.* In response, Garcia posted a message that stated, "Fuck it going to take [a pill] and sleep to Monday call me when people grab there fucking balls." *Id.* As others talked about their intent to "hit the

---

[2] Telegram is a message application that promotes itself as a secure means of communication. Among other things, on its "FAQs," Telegram states that because of its architecture "several court orders from different jurisdictions are required to force us to give up any data" and that Telegram has "disclosed 0 bytes of user data to third parties, including governments." Telegram FAQs, *available at* https://telegram.org/faq#q-why-should-i-trust-you.

streets," Garcia responded, in part, "Like I said if I receive a phone call today it bett[e]r be to lock and load if not enjoy your President elected[.]" *Id.*

On November 7, 2020, Garcia sent a text message to five other Vice City Proud Boys, including Enrique Tarrio and Gilbert Fonticoba, that stated, "Need to change Land of the free to Land of the fraud[.]" *Id.* at ¶ 28. Garcia later posted messages that encouraged the group to take action, including: "[w]hat are we going to do absolutely nothing" and "I am fucking tired of the stand fast shit[.]" *Id.*

Garcia knew that, on January 6, Congress, with Pence presiding, would be meeting to certify the Electoral College vote. *Id.* at ¶ 30. For example, on January 1, 2021, at approximately 6:41 p.m., Garcia sent a message to a group of Vice City Proud Boys, which group included Tarrio and Fonticoba. *Id.* at ¶ 31. In his message, Garcia said, "Pence is going to fold on the 6th[.]" *Id.* at ¶ 31. On January 1, 2021, at approximately 11:31 p.m., Garcia sent a message on Telegram to a group of ten other users, which group included Enrique Tarrio and Gilbert Fonticoba. Garcia's message said, "Oye Mike Pence is going to back down on the 6th and let Biden take it." *Id.* at ¶ 32. A few seconds later, Garcia sent a message that read, "We are fucked[.]" *Id.* at ¶ 32.

As explained below, Garcia had already begun preparations to return to Washington, D.C., and Garcia prepared for violent confrontation at the Capitol on January 6.

### *Garcia's Preparation to Return to Washington, D.C. on January 6*

On December 19, 2020, former President Trump announced plans for a Stop the Steal protest event in Washington, D.C., on January 6, 2021, which date coincided with Congress's Certification of the Electoral College vote. *Id.* at ¶ 34. Tarrio and a handful of other members of the Proud Boys created a new chapter for the Proud Boys that would consist of members from across the country. *Id.* The new chapter was referred to as the Ministry of Self Defense or MOSD

("MOSD"). *Id.* Tarrio described the MOSD as a "national rally planning" chapter that would include only "hand selected members." *Id.*

On December 27, 2020, Garcia was invited to join the MOSD by Tarrio. *Id.* at ¶ 35. Prior to joining the MOSD, Garcia completed a form in which he affirmed that: (1) everything spoken within the chapter would "remain private," (2) he was willing to provide "full cooperation with leadership" of the MOSD, (3) he would always "act in self defense," and (4) he would "Fit In or Fuck Off." *Id.*

The leadership of the MOSD created a private, encrypted message group on the platform Telegram in order to facilitate communication among the leaders and members of the MOSD. *Id.* at ¶ 36. Garcia participated in Telegram message groups among the members of the MOSD. In messages exchanged among members of the MOSD on Telegram, members discussed plans to come to Washington, D.C., for January 6 and discussed the potential for violence at the Capitol on January 6. *Id.* at ¶ 37. Garcia contributed to these discussions. *Id.* at ¶¶ 38 – 40.

On January 3, 2021, Garcia posted a message in the MOSD Telegram group that read, "1776 flag flying over the White House last night." *Id.* at ¶ 38. Garcia included an image that appeared to show the Betsy Ross flag flying over the White House. *Id.* Within minutes, another member posted a message that read, "Gonna be war soon ……" Garcia responded, "Yes Sir time to stack those bodies in front of Capitol Hill[.]" *Id.*

Approximately 20 minutes later, in the same chat, a different user posted the following message: "Also this ♟.  *Id.* at ¶ 39. So are the normies and "other" attendees going to push thru police lines and storm the capitol buildings?  *Id.* A few million vs A few hundred coptifa should be enough.  I saw a few normie groups rush through police lines on the 12th." *Id.*

On January 3, 2021, Garcia sent a text message to five other Vice City Proud Boys, including Enrique Tarrio and Gilbert Fonticoba, in which he stated that he would be taking a knife to Washington, D.C. When another user cautioned against it, Garcia replied that the knife was "not for defense is for offense we are always in defense continue to be fucking peaceful and thats how you end up like Cuba[.]" Garcia then posted a message in which he stated, "Taking also my light saber because stabing and blinding a mf twice is wonderful." Garcia then posted an image of a tactical laser pointer. Exhibit C.



On January 4, 2021, members of the MOSD exchanged additional messages on Telegram that discussed attacking the Capitol on January 6, 2021. *Id.* at ¶ 41. One MOSD member posted, "what would they do [if] 1 million patriots stormed and took the capital building. Shoot into the crowd? I think not." *Id.* In response, one of the leaders of the MOSD wrote, "They would do nothing because they can do nothing." *Id.* Garcia participated in the same message group on January 4. *Id.*

Enrique Tarrio was arrested upon his arrival in Washington, D.C. on January 4, 2021. *Id.* at ¶ 42. Tarrio was charged with the destruction a BLM banner in Washington, D.C. on December 12, 2020, and with the possession of two high-capacity magazines that were found in his possession during his arrest. *Id.* Tarrio was released from jail on January 5, 2021. *Id.* As part of

the conditions of his release, Tarrio was ordered to stay away from Washington, D.C., which meant that Tarrio would not be present in Washington, D.C. on January 6, 2021. *Id.*

Garcia made a number of posts on Facebook in which he expressed anger at the government and law enforcement for Tarrio's arrest, including:

    a.   On January 5, 2021, at 12:05 a.m., Garcia posted a message that stated, in part, "you wonder why we can't even trust simple crap from our own government. Fck black lives matter and ANTIFA and all the socialist garbage within our government and country."

    b.   On January 5, 2021, at 12:47 a.m., Garcia posted a message that stated, in part, "I swore to protect this great nation against all enemies foreign and domestic. Free Enrique Tarrio[.]"

    c.   On January 5, 2021, at 10:58 a.m., Garcia posted a message that stated, in part, "I think they planted some magazines in his vehicle because Enrique doesn't own a gun and doesn't even carry a pocket knife on him for this type of reason. The whole DC metropolitan area is croupt starting with the Mayor Bowser[.]" *Id.* at ¶ 43.

In response to Tarrio's arrest, Garcia and other members of the MOSD were directed by MOSD leadership to leave the original MOSD member chat on Telegram. *Id.* at ¶ 44. MOSD members were told that the MOSD members chat that included Tarrio would be "nuked" (*i.e.*, deleted). *Id.* A new Telegram MOSD member chat was created that did not initially include Enrique Tarrio. *Id.* Garcia was added to the group on January 4, 2021. *Id.* Garcia and other MOSD members were told in Telegram messages from MOSD leadership that the rally on January 6 would be continuing. *Id.*

On January 5, 2021, Garcia was also added to a private message group on Telegram for Proud Boys who had traveled to Washington, D.C. *Id.* at ¶ 45. The Telegram group was called "Boots on Ground." *Id.* Garcia and other members of the MOSD were told to meet at the Washington Monument at 10 a.m. on January 6. *Id.* at ¶ 46. Members were told not to wear Proud Boys colors and instead to "[c]ome out [] as patriot!" *Id.* The same instruction was issued in the Boots on Ground chat. *Id.*

### *Gabriel Garcia's Participation in the January 6, 2021, Capitol Riot*

On the morning of January 6, 2021, a group of more than 100 Proud Boys members met near the Washington Monument around 10 a.m. *Id.* at ¶ 47. As instructed, none of the men were dressed in Proud Boys colors of black and yellow. *Id.* At around 10:30 a.m., the group began to march away from the Washington Monument and the nearby speeches at the Ellipse. *Id.* The group marched east toward the U.S. Capitol. *Id.*

Garcia did not join the group at the Washington Monument or on the march toward the Capitol. *Id.* at ¶ 48. Rather, at 10:17 a.m. on January 6, 2021, Garcia posted a message in a Telegram group with other Vice City Proud Boys. Garcia reported, "I just fucking woke up getting ready." *Id.*

Around 1 p.m., Garcia was in Black Lives Matter Plaza. Garcia was wearing a shirt that read, "ENRIQUE TARRIO DID NOTHING WRONG!" *Id.* at ¶ 49. Garcia posted a message in the Boots on Ground Telegram group that said, "Nothing like Coffee in BLM Plaza" along with an image of himself in Black Lives Matter Plaza. *Id.*

Approximately one minute later, messages were posted in the Boots on Ground Telegram group that said, "Storming the capital building right now!!" and "Get there[.]" *Id.* at ¶ 50. Similar messages were posted in the MOSD Telegram group. *Id.*

In fact, at approximately 12:53 p.m., as former President Trump was still speaking to the crowd near the Ellipse, members of the large group of Proud Boys who had met at 10 a.m. near the Washington Monument had arrived at the west side of the Capitol and had breached the Capitol grounds. *Id.* at ¶ 51. Garcia was not part of this group of Proud Boys. *Id.*

At approximately 1:21 p.m., Garcia sent a message to Fonticoba on the Boots on Ground Telegram group and asked his friend, Gilbert Fonticoba, to provide his "current location." *Id.* at ¶ 52. Garcia then posted, "I am by the White House." *Id.*

At 1:29 p.m., Garcia called Fonticoba, and telephone records indicate that the call was answered and the connection lasted 63 seconds. *Id.* at ¶ 53.

At 1:32 p.m., Fonticoba posted a message in the Boots on Ground message group that said, "We are in front of the Capitol." *Id.* at ¶ 54. At 1:35 p.m., Fonticoba messaged "We are here and we got maze and hit with paint balls." *Id.* Fonticoba then sent the coordinates "38.889802, -77.011015," which resolve to the west lawn of the Capitol grounds. *Id.*

Garcia promptly joined the attack. Garcia walked toward the Capitol along Pennsylvania Avenue. *Id.* at ¶ 55. Garcia recorded an approximately three-minute-long video that showed a large crowd walking toward the Capitol in the distance. *Id.* As he walked and filmed, Garcia said, "Alright, going to the Capitol. You can't stop all this, look at this. No way." *Id.*

As Garcia approached the Capitol shortly after 2 p.m., Garcia saw members of the crowd climbing the scaffolding on the west side of the Capitol. *Id.* at ¶ 56. Plumes of smoke billowed into the air. *Id.* Garcia climbed on top of equipment that had been staged in preparation for the Presidential Inauguration on January 20, 2021, and Garcia moved toward the concrete stairs. *Id.* at ¶¶ 57-58. Garcia then climbed on top of the concrete stairs and climbed up the balustrade toward the Upper West Terrace. *Id.*



The concrete stairs led to the Upper West Terrace of the Capitol. *Id.* at ¶ 59. From the Upper West Terrace, members of the crowd had direct access to doors and windows of the Capitol. *Id.*

The first breach of the Capitol building took place at approximately 2:12 p.m. when members of the crowd broke windows to the left and right of the Senate Wing Door. *Id.* at ¶ 60. The Senate Wing Door is located on the west side of the Capitol on the Upper West Terrace. *Id.* Members of the crowd began to enter the building through the broken windows and the Senate Wing Door, which had been kicked open by rioters. *Id.*

Garcia entered the Capitol through the Senate Wing Door at approximately 2:16 p.m. *Id.* at ¶ 61. Before he entered, Garcia saw the broken windows and broken glass on the ground. *Id.* An alarm was sounding in the doorway. *Id.* Garcia understood that his entry into the Capitol was not authorized. *Id.*

After entering the Capitol, Garcia walked down the adjoining hallway and entered the area known as the Crypt at approximately 2:19 p.m. *Id.* at ¶ 62. Using his phone, Garcia recorded a video that showed the conditions in the Crypt. *Id.*; Exhibit D. As Garcia began recording, the crowd

was chanting "Our House!" *Id.* Within seconds, Garcia turned the camera toward himself and stated, "We just went ahead and stormed the Capitol." *Id.*

Garcia continued to record as he moved through the crowd and made his way to the front of the rioters. *Id.* Upon arriving near the front of the crowd, Garcia saw that officers had formed a line and were attempting to keep the crowd from advancing further into the Capitol building. *Id.* In Garcia's video, members of the crowd can be heard yelling at the officers as the crowd continued to chant, "Our House!" and "USA!" *Id.*

Garcia saw an individual push forward and attempt to breach the line of officers. *Id.* at ¶ 63. As officers controlled the individual, Garcia began to yell, "Fuck you guys, you fucking traitors. Fuck you." *Id.* Garcia moved to the front of the crowd and stood opposite the line of officers and within feet of U.S. Capitol Police Officer J.L. *Id.* Garcia could see that the officers were outnumbered. Garcia continued to yell at the officers, including the following statements, which were directed at Officer J.L. and the other officers:

- You ain't stopping a million. You ain't gonna hold a million back. Sorry. You ain't holding a million of us. Sorry.

- USA! Storm this shit.

- Fucking traitors.

- Our House!

- You ain't stoppin' a million of us. Keep it comin'. Keep it comin'. Storm this shit.

- How does it feel being a traitor to the country? How does it feel? *Id.*

At approximately 2:24 p.m., as Garcia remained at the front of the crowd in the Crypt, the crowd in the Crypt surged forward. *Id.* at ¶ 64. Garcia moved forward with the crowd as the crowd overwhelmed the line of officers and advanced further into the Capitol building. *Id.*

Garcia and others in the crowd continued to advance into the Capitol. *Id.* at ¶ 65. At approximately 2:28 p.m., Garcia and other members of the crowd again encountered a group of outnumbered officers, including Officer J.L. *Id.* The officers attempted to stop the crowd from advancing further into the Capitol. *Id.* Garcia again made his way to the front of the crowd and stood opposite an outnumbered line of officers. *Id.*

At approximately 2:31 p.m., the line of officers began to back away from the crowd and some in the crowd, including Garcia, followed the officers. *Id.* The officers rounded a corner and led the crowd toward an exit to the Upper West Terrace. *Id.* However, as officers attempted to direct the crowd toward the exit, the crowd, including Garcia, proceeded up a stairwell and into the Capitol Rotunda. *Id.*

Garcia recorded another video on his phone while he was in the Rotunda. *Id.* at ¶ 66. While filming, Garcia recorded himself saying, "Nancy, come out and play!" *Id.* "Nancy" referred to Speaker of the House Nancy Pelosi. *Id.* Garcia then spotted an individual wearing a black shirt with yellow sleeves—the Proud Boys' colors. Garcia called out to him, "Whose house?" *Id.* The man, a Proud Boys member from Oregon, responded "Our House!" *Id.* The two men came together in a congratulatory hug as Garcia said, "Proud of your fucking boy" and then "Uhuru!" which are both Proud Boys slogans. *Id.*

Garcia continued to record his video in the Rotunda. *Id.* at ¶ 67. Garcia then said, "Nancy! Nancy! Proud of your boy! Nancy! Uhuru! Free Enrique!" *Id.*

Garcia posed for pictures while in the Rotunda of the Capitol. *Id.* at ¶¶ 68-69. At approximately 2:47 p.m., Garcia climbed onto a statue of former President Ronald Reagan and posed for a picture with his "ENRIQUE TARRIO DID NOTHING WRONG!" t-shirt. *Id.* at ¶ 68.



At approximately 2:51 p.m., Garcia left the Rotunda and entered into a smaller, adjoining room. *Id.* at ¶ 70. A line of officers was preventing the crowd from advancing further into the Capitol, and the crowd was yelling at the officers. *Id.* Garcia briefly appeared near the front of the crowd at 2:56 p.m. before returning to the Rotunda at 2:58 p.m. *Id.*

One minute later, at approximately 2:59 p.m., Garcia approached a doorway in the Rotunda that was crowded with a pack of rioters facing a line of officers. *Id.* at ¶ 71. The rioters then charged forward, attempting to collectively push through the officer line. *Id.* Garcia used the weight of his body to join the rioters and push into the officer line, as shown in the image below. *Id.*; Exhibit E.



During the altercation, a chemical irritant was deployed, and Garcia turned to cover his face. *Id.* at ¶ 72. Garcia retreated to a nearby bench, took off his shirt, and poured water on his face to rinse his eyes. *Id.*



At about 3:06 p.m., police officers started to corral rioters out of the Rotunda towards the nearby Rotunda Doors. *Id.* at ¶ 73. Garcia exited the Capitol building at 3:16 p.m.—approximately one hour after entering the building through the Senate Wing Door. *Id.* at ¶ 74.

While standing on the steps of the Capitol building, Garcia was approached by a man with a camera who asked Garcia about his experience inside the Capitol. *Id.* at ¶ 76. In response to questions, Garcia stated, "We were just walking in. We didn't destroy or go in there with the intention to break anything. We want our voices heard. The cops are doing their job. I respect that." *Id.* Garcia was then asked about the "confrontation" with law enforcement inside the building. *Id.* at ¶ 77. Garcia responded, "Well, it wasn't a confrontation. *Id.* They were blocking not to let us go. *Id.* If we wanted to stay there, we could stay. But we're gonna obviously be forced to leave, which it's the nature of the game." *Id.;* Exhibit G.

Garcia trespassed onto Capitol Grounds, breached the Capitol building, and joined mobs and confronted officers inside the Capitol in order to disrupt Congress's certification of the Electoral College vote. *Id.* at ¶ 78. When he entered the Capitol building and remained inside for roughly an hour, he knew he was not allowed to be there. *Id.* When he confronted police on multiple occasions, he knew he was interfering with the police who were trying to get the rioters to leave the building. *Id.*

## III.    THE CHARGES AND STIPULATED TRIAL

On November 10, 2021, a federal grand jury returned an indictment charging Gabriel Garcia with six counts: 18 U.S.C. §§ 1512(c)(2), 2; 18 U.S.C. § 231(a)(3); 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G).

On November 20, 2023, Garcia was convicted of 18 U.S.C. §§ 1512(c)(2), 2 and 18 U.S.C. § 231(a)(3) as the result of a stipulated bench trial. As part of the stipulated trial, Garcia admitted that he "attempted to or did obstruct or impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote." SOO at ¶ 82. That is, Garcia admitted that his entrance into the Capitol on January 6 was done with "awareness that

the natural and probable effect of his conduct would be to obstruct or impede the official proceeding." *Id.*

On June 28, 2024, the Supreme Court issued its opinion in *Fischer v. United States*, 144 S. Ct. 2176 (2024)., which held that Section 1512(c)(2) does not cover "all means of obstructing, influencing, or impeding any official proceeding." *Fischer*, 144 S. Ct. at 2185. The Court held that, to prove a violation of Section 1512(c)(2), the government must establish that the defendant impaired the availability or integrity for use in an official proceeding of records, documents, objects, or other things used in the proceeding—such as witness testimony or intangible information—or that the defendant attempted to do so. *Id.* at 2186, 2190.

On August 9, 2024, citing the long pendency of this case, the government filed notice with the Court that it intended to proceed to sentencing on Count One. ECF 183. Specifically, the government asserted that it is in the interest of justice and judicial economy that the government dismiss Count Two and proceed to sentencing on Count One. *Id.* Accordingly, the government will move to dismiss Count Two at the Sentencing Hearing, and the defendant will be sentenced for his conviction on Count One, 18 U.S.C. § 231(a)(3).

## IV.    STATUTORY PENALTIES

Garcia now faces sentencing on Count One (18 U.S.C. § 231(a)(3)). As noted by the Presentence Report issued by the U.S. Probation Office, the defendant faces up to 5 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The Presentence Report sets forth the Guidelines calculations:

Count One: 18 U.S.C. § 231(a)(3)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1) | Offense Involved Physical Contact | +3 |
| | **Total** | **13** |

*Acceptance of Responsibility (U.S.S.G. § 3E1.1)*. Section 3E1.1(a) provides a two-level decrease in offense level "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." Similarly, Section 3E1.1(b) provides for an additional one-level reduction in offense level in certain circumstances applicable here. In determining whether to apply the adjustment, a court should consider, among other things, whether the defendant "truthfully admitt[ed] the conduct comprising the offense(s) of conviction, and truthfully admit[ed] or [did] not falsely deny[] any additional relevant conduct for which the defendant is accountable under § 1B1.3"— which includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" and all harm caused by those acts or omissions or was the object of those acts or omissions. U.S.S.G. §§ 1B1.3(a)(1)(A), 3E1.1 cmt. n.1(A). Under this standard, Garcia is eligible for a two-point reduction for his acknowledgement of guilt during the stipulated bench trial.

*Zero-Point Offender Reduction (U.S.S.G. § 4C1.1)*. Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet

certain additional criteria. Section 4C1.1 does *not* apply in this case because on several distinct occasions Garcia used violence and credible threats of violence in connection with the offenses, in contravention of § 4C1.1(a)(3). Among other things, as Garcia squared off with a line of outnumbered officers in the Crypt minutes after the first breach of the building, Garcia issued verbal threats on the mob's use of force, including "You ain't stopping a million. You ain't gonna hold a million back. Sorry. You ain't holding a million of us." Garcia called the officers, "Fucking traitors!" and then encouraged the mob to "Storm this shit!" SOO ¶ 63. Garcia then put those words into action as he joined the mob in rushing forward to overwhelm and overrun the officers, *id.* at ¶ 64, and move deeper into the Capitol building. In addition, Garcia repeatedly made his way to the front of the crowd as it stood opposite law enforcement. *Id.* at ¶ 65. Once in the Rotunda, Garcia approached a crowded doorway where a pack of rioters was facing off against a line of officers. *Id.* at ¶ 71. When the rioters pushed forward, Garcia used the weight of his body to join the rioters and forcefully push into the officer line. Garcia was deterred only after he was pepper sprayed in the face. *Id.* at ¶¶ 71-72. The government respectfully submits that the Final PSR has incorrectly applied 4C1.1 in this case. *See* ECF 188 at ¶ 109.

*Guidelines Range*

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR (ECF 188) ¶ 113.

The Final PSR calculates the Guidelines Range as 4-10 months based on an offense level of 9 and criminal history category of I. *Id.* ¶ 144. Were the Court to agree that a deduction under § 4C1.1 does not apply, the Guidelines Range is calculated at 8-14 months based on an offense level of 11 and a criminal history category of I.

*Departures and Variances*

After determining the defendant's Guidelines range, the Court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c). Because the defendant's Guidelines range does not capture the unprecedented and uniquely harmful nature of the crimes, which the Defendant explicitly acknowledged in the Statement of Offense, the government respectfully requests that the Court depart or vary upwards from the top of the Guidelines range.

The defendant was an avid and willing participant in an unprecedented crime. He joined a mob that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses. As he admitted, his offense targeted the peaceful transfer of power, an essential government function. The defendant "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work." *United States v. Brock*, 94 F.4th 39, 59 (D.C. Cir. 2024). As Judge McFadden put it to another rioter, "[Y]ou and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources." *United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Sent'g Tr. 9/22/22 at 86-87.

But nothing in this defendant's Guidelines calculation reflects these facts. The defendant would face the same offense level if his crimes had not targeted the democratic process or interfered with the peaceful transfer of power.[3] There is no specific offense characteristic in the

---

3 The D.C. Circuit's holding in *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024), finding that certain sentencing enhancements did not apply to the Congress's counting and certification of the electoral college votes, despite acknowledging that interference with this process "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work" demonstrates that the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. And the Supreme Court's recent decision in *United States v. Fischer*, -- S.Ct. -- (2024) demonstrates that even the criminal code lacks the appropriate tools to fully

Guidelines for attacking democracy or abandoning the rule of law. "And simply saying, yeah, I know I trespassed, I trespassed, that's not really capturing the impact of what that day meant when all of those members of Congress met there to fulfill their constitutional duty." *United States v. Calhoun*, 21-CR-116-DLF, Sent. Tr. at 85. A sentence within the defendant's Guidelines range here would not "reflect the seriousness of the offense," "promote respect for the law," or "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

The Guidelines expressly state that an upward departure is warranted where a case presents a circumstance that "may not have been adequately taken into consideration in determining the applicable guideline range" or that "the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence." U.S.S.G. § 5K2.0(a)(2). The Guidelines also provide that a departure is warranted when an offense results in "a significant disruption of a governmental function" and the Guidelines do not reflect the appropriate punishment for the offense. U.S.S.G. § 5K2.7.[4] In such circumstances, "the court may increase the sentence above the authorized guideline range to [1] reflect the nature and extent of the disruption and [2] the importance of the governmental function affected."

As judges of this district have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—conducing the peaceful transfer of power. "The events that occurred at the Capitol on January 6th will be in the history books that our children read, our children's children read and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-CR-

---

address the crimes of January 6. *See Fischer*, slip op. at 29 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

4 This guideline does not require the government to establish a direct link between the defendant's misconduct and the alleged disruption, nor does it "require that the disruption be of any particular type or consequence." *See United States v. Saani*, 650 F.3d 761, 765–66, 771 (D.C. Cir. 2011).

75-RDM, Sent. Tr., at 67. The damage done to this country on January 6 must be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime. As one judge explained,

> The effort undertaken by those who stormed the Capitol on January 6 and those who entered the Capitol or who, like the defendant, sought to, but didn't ultimately enter the Capitol, that effort was to stop the peaceful transfer of power following the legitimate outcome of our presidential election. That's a process that has been a hallmark of American democracy for 200 years. And that effort to reject the outcome of the 2020 presidential election involved an unprecedented and, quite frankly, deplorable attack on our democratic institutions, on the sacred ground of the United States Capitol building, and on the law enforcement officers who were bravely defending the Capitol and those democratic values against the mob of which the defendant was a part.

*United States v. Languerand*, 21-CR-353-JDB, Sent. Tr., at 33-34. And as another judge explained:

> He just wanted to delay the certification. He wanted the election certification stopped. That's chilling to me. I mean, that is not a minor thing, in that through -- through acts of violence and intimidation, we're going to stop the most sacred day in our democracy from occurring, which is the certification of the election, because we want some more time to try and make our case because the dozens and dozens of courts that have considered the issue and have concluded there was not a problem with the election weren't enough, and because I want someone else to take another look at this. And so, therefore, I'm going to go down to the Capitol and I'm going to stop the certification of the election from occurring. So I think that the offense here, to my mind, is one of enormous gravity.

*United States v. Wyatt*, 23-CR-215-RDM, Sent. Tr. at 44.

Indeed, even before *Fischer*, judges of this Court gave significant upward departures and/or variances in January 6 cases when they found the advisory guideline range inadequate. *See, e.g.*, *United States v. Hale-Cusanelli*, 21-CR-37-TNM, 9/22/22 (Sent. Tr.); *United States v. Christian Secor*, 21-CR-157-TNM, 10/19/22 (Sent. Tr.); *United States v. Hunter and Kevin Seefried*, 21-CR-287-TNM. 10/24/22 (Sent. Tr.); *United States v. William Watson*, 21-CR-513-RBW, 3/9/23 (Sent. Tr.); *United States v. Riley Williams*, 21-CR-618-ABJ, 3/23/23 (Sent. Tr.); *United States v. Hatchet Speed*, 22-CR-244-TNM, 5/8/23 (Sent. Tr.).

And this court has joined several others who have upwardly departed in January 6 cases precisely because the advisory guideline range did not adequately take into account all of the relevant circumstances. *See United States v. Eicher*, 22-cr-38 (BAH), Sent. Tr. 9/15/23 at 50 (applying § 5K2.7 because the defendant "join[ed] a mob, in the center of the melee, and through the sheer numbers and aggressive conduct towards police, breached the Capitol resulting in stopping the legitimate business of Congress for hours"); *United States v. Black*, 21-CR-127-ABJ, Sent. Tr. 5/16/23 at 27 (applying an upward departure pursuant to § 5K2.7 for a January 6 rioter).

For example, recently, in *United States v. Sparks*, 21-CR-87-TJK, Judge Kelly sentenced a defendant convicted of violating both 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 231. Prior to sentencing, in light of the Supreme Court's *Fischer* decision, the government moved to dismiss the § 1512(c)(2) count, and at sentencing, Sparks faced an advisory guideline range of 15-21 months. Judge Kelly found it important that, despite the dismissal of the § 1512(c)(2) count, the defendant's conduct still included "an intent to obstruct or interfere with that proceeding, that important constitutional proceeding" which the court found to be "pretty dark behavior" which "posed a threat to whether our constitutional process will proceed or whether a mob would interfere with that process." *Sparks* Sent. Tr. at 87-88. The court found that the "typical person convicted of [18 U.S.C. § 231] engaged in nothing at all like the attack on the Capitol and the certification." *Id*. at 94-95. Because Sparks' advisory guideline range was driven by the § 231 conviction, that range did not "account for the defendant's intent to obstruct, not just law enforcement officers doing their duty under that statute, but a proceeding, or for the purposes of [U.S.S.G. §] 5K2.7, a governmental function. And not any proceeding, but one foundational to our country's governance." *Id.* at 93. The court found Sparks' intent to "interfere or obstruct with the electoral college vote certification . . . plays an important role in explaining why" Sparks' advisory guideline

range did not fully account for his criminal conduct. *Id.* at 94. Accordingly, the court found a significant upward departure was warranted under both U.S.S.G. §§ 5K2.7 and § 5K2.21, and in the alternative a variance of equal amount was warranted under the § 3553(a) factors, and sentenced Sparks to 53 months of imprisonment.

Similarly, in *United States v. Robertson*, 21-CR-34-CRC, Judge Cooper resentenced a defendant after dismissal of a § 1512(c)(2) conviction post-*Fischer*. Without that conviction, the court determined that a new advisory guideline range of 37 to 46 months applied. *See Robertson* Sent. Tr. at 59. But the court also found that an upward departure was appropriate pursuant to U.S.S.G. § 5K2.7, because Robertson's conduct "resulted in a significant disruption of a governmental function, namely halting of the certification . . . and that is so regardless of whether Section 1512(c) applies." *Id.* at 61. The court also found an upward departure appropriate under U.S.S.G. § 5K2.0 because Robertson's conduct was "more harmful or egregious than the typical case represented by the otherwise applicable guideline range." *Id.* After considering the § 3553(a) factors, Judge Cooper sentenced Robertson to 72 months of imprisonment.

Likewise, in *United States v. Dunfee*, 23-CR-36-RBW, Judge Walton sentenced a defendant on a § 231 conviction and a misdemeanor, after his § 1512(c)(2) conviction was dismissed in light of *Fischer*. Judge Walton found an upward departure was warranted under U.S.S.G. § 5K2.7, because Dunfee's actions contributed to and resulted in a significant disruption of the certification of the electoral college vote. Moreover, noting that "the Sentencing Commission did not contemplate the circumstances that occurred on January 6," the court also found that a departure was warranted under U.S.S.G. § 5K2.0(a)(2) because Dunfee's criminal conduct related to "the attempt by a large number of individuals, including the defendant, to stop the peaceful transfer of power." *See United States v. Dunfee*, 23-CR-36-RBW, ECF No. 90, at 2.

From an advisory range of 18-24 months, the court sentenced Dunfee to 30 months of imprisonment.

Most recently, in *United States v. Oliveras*, 21-CR-738-BAH, Judge Howell sentenced a defendant on a § 231(a)(3) conviction, a § 111(a)(1) conviction, and four misdemeanors, after his § 1512(c)(2) conviction was dismissed in light of *Fischer*. Judge Howell found an upward departure was warranted under U.S.S.G. § 5K2.7 (Disruption of Governmental Function) because

> after *Fischer*, with the dismissal of [the defendant's] 1512(c)(2) conviction, none of the conduct that goes into determining defendant's sentencing guidelines reflect his intent to engage in political violence that poses such a threat to our American democracy. . . . His intent to obstruct Congress in the Electoral College certification by violence, if necessary, go above and beyond what any of his current convictions now take into account.

*Oliveras*, 21-cr-738 (BAH), Sent. Tr. at p. 49. The court noted that, "[i]n assessing the extent of the departure, review of how the guidelines for obstruction of an official proceeding at [U.S.S.G. §] 2J1.2 would have applied to defendant [pre-*Brock*] provide a general guide . . . [and] an upward departure within that range is appropriate." *Id.* at 49-50. The court also noted that it "would impose the same sentence with . . . an upward variance for the same reasons that are outlined in § 5K2.7 and consideration of the 3553(a) factors." *Id.* at 97. From an advisory Guidelines range of 37-46 months' imprisonment, the court sentenced Oliveras to 60 months of imprisonment.

Because the seriousness of defendant's crime is not adequately captured by the applicable Guideline, an upward departure is appropriate here as well. If the Court declines to depart, an upward variance is warranted. An upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up). While the Supreme Court's decision in *Fischer* has changed defendant's advisory Guideline range, "*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the

Court may still consider [defendant's] serious conduct on January 6th, 2021 in its entirety. To reduce [defendant's] sentence . . . would require this Court to take a drastically different view of [defendant's] conduct." *United States v. Hostetter*, 21-CR-392-RCL, ECF 507, Sent. Tr. at 4-5 (cleaned up). Indeed, "*Fischer* does not mean that I cannot consider at sentencing evidence that establishes that the defendant intended to obstruct Congress' certification of the electoral vote in determining whether . . . the resulting guideline range fully accounts for the criminal conduct." *Sparks* Sent. Tr. at 95; *see also United States v. Kelly*, 21-CR-708-RCL, ECF 151, Sent. Tr. at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)"); *United States v. Jensen*, 21-CR-6-TJK, Sent. Tr. at 16 ("given the importance and the significance of the proceeding of certifying the Electoral College votes, I would vary upward -- even if this [sentencing enhancement] didn't apply, I would vary upward when considering the nature of the offense.").

In past sentencings, this court has made clear its view that January 6 was an "attack on the democratic process and the peaceful transfer of power that until that day had been one of the fundamental things that made America[,] America[.]" *United States v. Thomas Patrick Hamner*, 21-CR-689-ABJ, Sent. Tr. at 45:14-20. "It was unprecedented. It was intolerable. And it caused incalculable harm." *Id.* Gabriel Garcia set out to stop the transfer of power, and he used force and threats of violence to accomplish his objective.

In addition to departing upwards, other courts have varied upward from the advisory guideline range specifically because of the unique and serious nature of the crimes committed that day; this Court should do no less. *See United States v. Reffitt*, 21-CR-32-DLF, Mem. Op. and Order

4/10/24 at 10-11 (upward variance would be justified because "as other judges in this district have noted, the proceedings at issue on January 6, 2021 were of much greater significance than run-of-the-mill 'judicial, quasi-judicial, and adjunct investigative proceedings'"); *United States v. Fonticoba*, 21-CR-638-TJK, Sent. Tr. 1/11/24 at 66-67 (stating that, even if the defendant's § 1512 conviction were invalidated, a significant upward variance was warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself"); *United States v. Secor*, 21-CR-157-TNM, Sent. Tr. 10/19/22 at 53 ("I believe both the seriousness of the event — you obstructed the certification of an official proceeding — and your particular role in it . . . require a significant upward variance"); *United States v. Hale-Cusanelli*, 21-CR-37-TNM, Sent. Tr. 9/22/22 at 87 ("I also believe the extensive damage and injuries caused on January 6th with your fellow rioters require additional punishment beyond what my [guideline] calculation allows.").[5]

In this case, the government submits that a significant upward variance and/or departure is warranted to reach an appropriate sentence. Garcia intended to stop Congress's certification of the Electoral College (*see* SOO ¶ 82), and he carried out his objective through the use of force and

---

[5] The D.C. Circuit has made clear that it "ordinarily presume[s] a district court imposing an alternative non-guidelines sentence took into account all the factors listed in § 3553(a) and accorded them the appropriate significance." *United States v. Warren*, 700 F.3d 528, 533 (D.C. Cir. 2012) (quoting *United States v. Ayers*, 428 F.3d 312, 315 (D.C. Cir. 2005)). But as recently discussed in *United States v. Iracks*, 2024 WL 3308241 (D.C. Cir. July 5, 2024), for a sentence above the applicable Guidelines range, the Sentencing Reform Act provides that the district court must state "the specific reason for the imposition of a sentence different from that described [in the Guidelines,]" both orally during the sentencing and on a written form appended to the judgment. 18 U.S.C. § 3553(c)(2) (emphasis added). Accordingly, the government requests that the Court make specific findings that this defendant's "conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range" and "explain why the otherwise applicable Guidelines calculation 'does not fully account for the described criminal conduct.'" *United States v. Brown*, 892 F.3d 385, 404-05 (D.C. Cir. 2018) (quoting *Brown*, 808 F.3d at 867, 872 (D.C. Cir. 2015)).

threats of violence against law enforcement officers (*id.* at ¶¶ 62-64, 71). Such conduct places Garcia in a markedly different category than other defendants that this court has sentenced. For example, Joshua Black was sentenced by this Court to 22 months of incarceration. *United States v. Joshua Black*, 21-CR-127-ABJ, Sent. Tr. at 80:10 – 22. The Court imposed this sentence after concluding that there was "basically no evidence" that Joshua Black "intended to obstruct or impede a specific official proceeding." *Id.* at 9:18-10:1. "The conduct was intentional and it cannot be marginalized with the kind of sentence that would be appropriate and that has been handed down [] in the case of a mere parading or disorderly conduct misdemeanor[.]" *Id.* at 66:24-67:4.

There can be no serious question that the Sentencing Guidelines for a violation of the Civil Disorder statute (18 U.S.C. § 231) fail to capture the seriousness of the conduct. A significant upward departure or variance is necessary to address the defendant's criminal conduct for which he has been convicted.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As established in the Statement of Offense and recounted herein, Garcia's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. For Garcia, this was no aberration—it was the uprising that he had hoped for and the violence that he had prepared for during previous visits to Washington, D.C. Garcia did not get swept up in the massive riot, he sought it out. Garcia responded to reports of "storming the Capitol" and police responding with "maze" and "paint

balls" by charging toward the melee and taking a position at the front. He threw himself into the violence against what he viewed as the uniformed "traitors" in a misguided effort to subvert the democratic process.

The nature of Garcia's criminal conduct was exceptionally egregious, and examining the broader circumstances and consequences of his actions show the great harm they caused and continue to cause. Indeed, as described in the following section, Garcia has actively participated in a campaign of deceit to mislead the American public about his conduct, which serves to exacerbate the underlying offense.

**B. The History and Characteristics of the Defendant**

Garcia is 43 years old and resides in Miami, Florida. Garcia served in the U.S. Army for 15 years, and he received an honorable discharge in 2017 with the rank of Captain. Since separating from the Army, Garcia has received disability benefits and has been self-employed in a variety of industries. Garcia has no criminal history other than the instant offense. These are all highly commendable facts that favor the defendant.

However, during the pendency of this criminal case, Garcia has exhibited continued disrespect for the rule of law. As detailed in the Government's submission at ECF 106, Garcia blatantly disregarded this Court's orders and openly disparaged other proceedings involving other January 6 defendants. Specifically, Garcia filed an emergency motion to travel to observe trial in Washington, D.C. in March 2023. After receiving approval to travel to observe trial, Garcia spent the majority of his time in the D.C. area attending CPAC and openly disparaging the legal proceedings in District Court. When called to account for his attendance at CPAC, Garcia offered the following on social media:



🏴‍☠️J6 CPT GABRIEL GARCIA
954 subscribers

Government: Why did your client go to CPAC

Attorney: Is outside the circus district.

Government: You stated your client was there with you to the afternoon but he was at National Harbor can you please clarify.

My answer on what I would have said because I got tired of the false prosecution and looking at that Jury panel that all look like they belong on some MSNBC panel with their double masks made me sick so I decided to exit and leave the fucking district for good. Any further questions???

 1

126 👁 03:23 PM

In an interview with the Miami Herald in 2021, Garcia attempted to blatantly distort the nature of his actions and told the American public that he thought he was "allowed to go in" the Capitol. Exclusive interview with Miami Proud Boy charged in Capitol breach, Miami Herald, available at  https://www.youtube.com/watch?v=SQzDZsa5xGI. Garcia stated that he felt he "had no wrongdoing" and that "if a door is open, I thought I could go in." *Id.* Garcia asserted that a "guy" outside the door told him that he could go inside the Capitol. *Id.* When pressed, Garcia explained that the guy was not in uniform, but Garcia thought "he might be part of it because he was dressed nice" and Garcia "figured he was maybe a worker there." Garcia further asserted that he followed all police commands that day—"I guarantee you that if there was a cop or barricade there, I would not have been in there." In fact, as Garcia has now admitted, Garcia entered amidst broken glass through a blaring alarm and he understood that his entrance into the Capitol was unlawful. Once inside, Garcia actively participated in confrontations with police, including the mob's efforts to breach a police line in the Crypt and Rotunda. SOO ¶¶ 62-64, 71.

Put simply, the characteristics of the defendant have been laid bare through the pendency of this case. Garcia has made January 6 part of his identity, and Garcia seeks affirmation of his actions as honorable and part of his duty to country. Garcia's conduct has demonstrated a profound lack of appreciation for the harm that he contributed to on January 6.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of 48 months' incarceration. Garcia's criminal conduct on January 6 was the epitome of disrespect for the law. *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

In Garcia, the Court must confront a defendant that blatantly disregarded the rule of law on January 6 and has since characterized his actions as nothing more than a trivial trespassory offense. Stripped of respect for the peaceful transfer of power and the rule of law, our country would be left with mob rule where the ends justify the means. The sentence must reflect Garcia's intentional use of force to undermine the fundamental principles of our democracy.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A sentence of 48 months is appropriate and necessary "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. As discussed above, Garcia has made January 6 part of his identity. As Garcia emerged from the Capitol on January 6, he felt pride in his actions to oppose law enforcement as the "nature of the game." SOO ¶ 76. Garcia has since characterized his actions as patriotic and the efforts to hold those responsible as a "false prosecution."

All of these factors strongly indicate that a lengthy term of incarceration is necessary to deter Garcia from similar behavior in the future. Garcia's was not merely swept up into the mob along with the crowd. Garcia prepared for and thirsted for conflict—just as he had during his previous visits to Washington, D.C. when he celebrated "knock[ing] out 4 motherfuckers yesterday" and that such conduct "felt great." Garcia came prepared to storm the Capitol and "stack bodies"[6] in front of the Capitol in order to achieve his political goals. Garcia's continued positioning at the front of the mob and encouragement of the rioters to oppose the "traitors" reflects Garcia's commitment to carrying out his vision.

---

[6] The government acknowledges that Garcia did not strike an officer or literally "stack bodies" in front of the Capitol, and the government acknowledges that this mitigates the severity of Garcia's conduct as compared to other rioters who engaged in such behavior. Had Garcia done so, the government would have sought a lengthier sentence of incarceration here. Garcia prepared for and did participate in a riotous storming of the Capitol in order to disrupt the peaceful transfer of Presidential power, and Garcia used force and threats of violence at the Capitol to achieve his objective. The crime counsels for a significant period of incarceration.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section

3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[8] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

---

[7] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Even after vacating Garcia's Section 1512(c)(2) conviction, the court can look to several comparators to confirm that no unwarranted sentencing disparities would result from a sentence of 48 months here. That is because, at base, all of these individuals were convicted of intentionally invading the Capitol on January 6 to disrupt the peaceful transfer of power. Whether or not it is independently criminalized under statute, that fact remains of primary significance in assessing their cases.

Garcia is closely comparable to Gilbert Fonticoba, his friend and fellow Proud Boys member. Fonticoba was sentenced to 48 months of incarceration for violations of 18 U.S.C. §§ 231(a)(3) and 1512(c)(2), and Judge Kelly specifically noted that the Court would have imposed the same sentence even had Fonticoba only been convicted of Section 231(a)(3). Fonticoba breached the Capitol grounds and building, helped destroy a black metal fence, and interfered with officers who were trying to stop the crowd's advance because he wanted to stop the Certification of the Electoral College vote. *See United States v. Fonticoba,* 21-cr-638, (TJK), Gov. Sent. Mem., ECF No. 57 at 2, 5-6, 9-11. Fonticoba marched to the Capitol with members of the Proud Boys, and Fonticoba joined the group as they breached the West Front together. The Proud Boys, including Fonticoba, then advised others (including Garcia) via Telegram that the Capitol had been breached. In fact, Garcia and Fonticoba were in direct contact, and Fonticoba advised Garcia of the conditions on the grounds of the Capitol and provided his specific location. Like Garcia, Fonticoba had no criminal history. Similar to Garcia, Fonticoba publicly promoted a false narrative about January 6; celebrated his conduct on January 6; he celebrated the Proud Boys' acts of violence; was connected to the group's leadership; and was part of a hand-selected group of Proud Boys that openly discussed the potential for violence at the Capitol on January 6 in a Telegram messaging group. Fonticoba's Section 231 involved destroying the black metal fence

lining the Lower West Terrace. Fonticoba subsequently entered the Capitol, but left within minutes. Garcia entered the Capitol and remained for approximately an hour. And Garcia actively opposed law enforcement while inside the Capitol, calling them "traitors" and twice attempting to breach a police line in the Capitol. As Judge Kelly explained at Fonticoba's sentencing, "even if [Fonticoba] had only been convicted under [Section 231(a)(3), the Court] would have varied upward and imposed the same 48-month sentence." *See* Memorandum Order, *United States v. Fonticoba,* 21-cr-638, (TJK), ECF No. 81 at 4-5 (explaining that such upward variance would be appropriate to "afford adequate deterrence to criminal conduct" and necessary to "reflect the seriousness of the offense."). Judge Kelly specifically noted that Fonticoba—like Garcia— specifically admitted to intending to obstruct Congress's certification of the Electoral College vote and to doing so corruptly.

A sentence of 48 months would be less than similarly situated defendants who have been sentenced after the Supreme Court's decision in *Fischer. See* discussion, *supra*, at Part V (discussing *Sparks* and *Robertson*).

## VII.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C.  § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).

Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property . . . including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted).

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full

restitution without respect to a defendant's ability to pay.[9]

    Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

    More specifically, the Court should require Garcia to pay $2,000 in restitution for his conviction on Count One. This amount fairly reflects Garcia's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and

---

[9] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.    FINE

The defendant's convictions subject him to a statutory maximum fine of $250,000 for Count One. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range for Offense Level 8 is $2,000 to $20,000. U.S.S.G. § 5E1.2(c).

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court sentence Garcia to 48 months of incarceration, three years of supervised release, $2,000 restitution, a fine, and the mandatory assessment of $100 for his felony conviction.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar Number 481052

By:     /s/ *Jason McCullough*
JASON B.A. MCCULLOUGH
D.C. Bar No. 998006; NY Bar No. 4544953
Assistant United States Attorney
601 D Street, NW
Washington, D.C. 20579
(202) 252-7233 // Jason.McCullough2@usdoj.gov

/s/ *Ashley Akers*
ASHLEY AKERS
MO Bar #69601
Trial Attorney
Detailed to the United States Attorney's Office
601 D Street, N.W.
Washington, DC 20530
(202) 353-0521 // Ashley.Akers@usdoj.gov